Mr Justice M’Lean
 

 delivered the opinion of the Court..
 

 This case is brought before this court by an appeal from the decree of the circuit court for the western district of Tennessee.
 

 In their bill the complainants state, that on the 22d of Feb.ruary 1785, a certain entry in the land office of North Carolina was made by Isaac Coulson, assignee of David Welles, for six hundred and forty acres of land ; and that afterwards, on the 2d of January 1787, he executed a bond to one Josiah Payne, for the conveyance of said tract of land, agreeably to the terms therein expressed, to wit.: “Know all men by these presents, that I, Isaac Coulson, of the state of North. Carolina and county of Davidson,- do oblige myself, my heirs and assigns, to pay to Josiah Payne one hundred pounds in Virginia currency, in payment, for a certain hay stud horse I bought of him. within
 
 *71
 
 twelve months from the date hereof, with lawful interest, otherwise, in lieu thereof, l do oblige myself to make over all my right and interest of a certain entry and warrant of land of six. hundred' and forty acres, lying on the north side of Cumberland river, on said river, about one or two miles above the mouth of the Caney fork,, unto the said Josiah-Payne, of the county and state aforesaid, or his heirs and assigns. And if a deed or grant should issue to me, before said entry or warrant should be transferred from me to said Payne, then, and in that case, I do hereby oblige myself to make a transfer deed of all my right, title and interest of the aforesaid land, unto the aforesaid Josiah Payne or his
 
 assigns;
 
 which deed and right, when made, is to be taken in full payment for the one hundred pounds and interest ; and I do hereby oblige myself to warrant and defend said deed from me, my heirs and assigns, for ever, unto the said Payne and his heirs.” Which bond purports to have been signed and sealed by the said Isaac Coulsoti, and witnessed by James Donelson and William Bush.'
 

 The complainants further state, that the obligor elected to pay the said sum of one hundred, pounds, by giving the land as expressed in the above recited bond; which mode of payment was assented to by the said Payne. That said Isaac Coulson died intestate sometime in the year 1791, leaving the defendant his only heir at law. • That a grant was issued for theland -on the 15th of September 1787, but no valid conveyance was made to the said Payne for the land, although in his lifetime various means were tried to obtain a title. That possession was taken of the land in 1799 or 1800, and that it has been occupied ever since under the title of Payne; and that the taxes have Been paid. That since the defendant has arrived at full age He commenced an action of ejectment, and recovered a judgment for the land ; and the complainants pray an injunction, and that the defendant may be decreed to convey all his interest in the premises to the complainants.
 

 In his answer the defendant denies - that the bond set forth in the complainants’ bill, was ever executed by bis father, Isaac Coulson, and states that it is a forgery; and he denies the other material allegations in the bill..
 

 In considering the question as to the genuineness of the bond on which this controversy is founded, the first importantfact
 
 *72
 
 that occurs to the mind is, the remoteness of the transaction. Nearly half a century has elapsed since this instrument purports to have been executed. The obligor and the obligee, and both the witnesses are dead. The contract belongs to the past age. - It was executed, if at all, when the country was new and unsettled; and the parties to it seem to have been illiterate men, and unacquainted with business transactions.
 

 These circumstances are referred to, not to show that this bond should be received without proof, but to show, that as strict proof should not be required of its execution, as if it were ■of recent date. The law makes some allowance for the frailties-of memory, and where a great length of time has elapsed since the signing of an instrument'attempted to be proved, circumstances are viewed as having an important bearing upon the question.
 

 In the case of Barr v. Gratz, 4 Wheat. 231, this court decided, “ that where a deed is more than tbirty years old, and is proved to have been in the' possession of the lessors of the plaintiff in ejectment, and actually asserted by them as the ground of their title in a chancery suit, it is, in the language of the books, sufficiently accounted for; and it is admissible in evidénce without regular proof of its execution by the subscribing witnesses.”
 

 There is no proof of the handwriting of James Donelson, one of the subscribing witnesses to this bond; but it is proved that he was supposed to have, been killed by the Indians many years ago.
 

 The handwriting of Bush, the other subscribing witness, is proved by three of his sons, who were well acquainted with his hand, one of them having administered on his' estate. These witnesses, and especially two of them, speak with great . confidence, not only as to the signature of their father, but they say that the body of the bond appears to have been written by him. And they state, that although at the time the bond bears date, and for some years before and afterwards, until.his death, their father lived in Clark county, Kentucky, yet he was absent the greater part of his time on hunting expeditions; and they understood that he was several times in the western part of Tennessee. It appeared that their father understood survey
 
 *73
 
 ing, was a pretty good scrihe, was write deeds and other instruments.
 

 Three witnesses testify to the original contract, and the circumstances which led to it. Payne sold to Coulson a valuable horse, for which he agreed to pay one hundred pounds. Sometime afterwards, Coulspn, finding the horse did not suit his purpose, induced Payne, as his agent, to sell him; which was done, for the tract of land now in controversy. It was afler this sale, as these witnesses say, that they understood a bond was executed, by which Coulson was bound to pay to Payne, one hundred pounds, or .convey the land to him in lieu of the money. Two witnesses state, that iri addition to the land,' Coulson agreed to pay Payne 50 dollars, in a horse.
 

 George' Cumming, and the sister of Josiah Payne were acquainted with William Bush'; and the latter was a,lso acquainted with the other witness, James Donelson.
 

 Sometime after the date of the bond, Coulson, it is proved, went to Virginia under the expectation of obtaining money to pay off the bond, from the estate of his father: but he found that the estate had been wasted ; and being disappointed in .raising the money, he remained in Virginia, married, .arid after-wards died in 1791. In the year 1793 Payne went to Virginia, and obtained from the widow of Coulson a bond, in a penalty, dated the 6th of Novembér 1793, with a condition to convey all her interest in the land in dispute; and she authorized Payne to take possession of it. This bond was executed -by the widow, on the advice of Jacob Coulson, her brother-in-law, that it-was best to discharge the claim by. the conveyance of the land:
 

 An attempt was made to obtain a conveyance under the •sanction of a county court' in Virginia, and Mrs Coulson attended the court for that purpose; but the decision was, that it had no power to act on the subject.
 

 At another time Payne made application to the widow, and said he ought to have something, as he should have to wait until the children became of age ; and she let.him have a horse worth fifteen pounds.
 

 In 1797 or 1798, it appears aman by the name of Johns was sent to Virginia for this tille, and was informed by Payne that he would probably find it ready for him. At this time, Mrs
 
 *74
 
 Coulson, Jacob Coulson and Benjamin Johns, went to the court in Grayson county, Virginia,and were three days in attendance on it, endeavouring to procúrela title for the land, but failed.
 

 Payne had then sold a part of this land to Johns, but as no deed could be obtained, Johns was unwilling to. take the land, and he exchanged it with Walton, who in 1799 or 1800 took possession of a part of the tract, and has ever since held it by himself and his heirs. At a subsequent period he made other purchases of the tract. It was known as Payne’s land, from the time Johns went to Virginia for a title..
 

 Payne died in 1805, and his heirs endeavoured' to obtain a title by permitting the land to be sold for taxes, in 1806; and they became the purchasers. Shortly after this sale, George Payne, son and administrator of josiah Payne, went to Grayson county, Virginia, and procured a release of all claim to the land from the representatives of Coulson; and in which they'stipulated not to redeem the land, under the sale for taxes. This instrument has been lost. George. Payne was drowned a few years after the writing was obtained by him.
 

 These are the material facts and circumstances relied on by the complainants, to prove the execution of the bond, and to lay the foundation to the equitable- relief prayed for in the bill.
 

 A great number of depositions were read by the defendant’s counsel, to rebut the facts proved by the complainants, and show that they are not entitled to relief.
 

 Six witnesses state that they were acquainted with William Bush, and several of them with James Donelson. That they both came from the Indian nation, and were supposed to be tones and refugees. That Bush was a dissipated man, was occasionally deranged, and incapable of business. That he had a brother named Abner, who was a man of good capacity, and of respectable character: that they were both hunters, and were well acquainted with the water courses falling into the Mississippi river, south of the Tennessee.
 

 Donelson and William Bush were reported to have been killed by the Indians in years 1786 or 1787.
 

 The depositions of three witnesses were read by the defendant, who were well acquainted with William Bush in Clark county, Kentucky, and who from their intimacy with him and the short distance they lived from him, about the lime the bond
 
 *75
 
 bears date, seem to think he could not home at that time.
 

 And it is proved by Jeremiah Coulson, brother of Israel, that when Payne was in Virginia, a conversation took place between him, the witness and Jacob Coulson, at which time Payne said he had no obligation or any instrument, of writing from Isaac Coulsón, respecting the land in dispute; And that Payne also said lie was to receive from Coulson á negro boy, under twelve years old, in discharge of the
 
 debt;
 
 and at the same time he agreed to pay the taxes on said land, and take care of it for the children of said Coulson; and the,witness was called on specially to remember the agreement. At this time Payne received horse of Mrs Cpulson worth 50 dollars, in part payment of the claim.
 

 The first inquiry which naturally arises in the mind on reading the whole evidence is, whether it may not be reconciled. Some parts of it, and especially those parts which relate to the subscribing witness, William Bush, would seem to conflict; but this is susceptible of a most satisfactory- explanation.
 

 There can be no doubt from the facts stated by the witnesses, that there were two persons who bore the name of William Bush, and who were occasionally in the western part of Tennessee, about the same time., One of them, the Kentucky Bush, was a respectable man, a deacon in the Baptist church, a surveyor, wrote a good hand ; and he died in Clark county, Kentucky^ about the year
 
 1816.
 
 The other was'believed to have come from- the Indians, was an ignorant, dissipated man, incapable of business, accustomed to hunting in the country south of the Tennessee river,, and was reported to have been killed by the Indians in 1786 or 1787. He had a brother named Abner,- who is proved to have been in no way connected with the Kentucky Bush.
 

 The mere statement of these facts is enough to convince qvery one, that the different witnesses, in describing the character, capacity .for business, pursuits, residence and death of William Bush, could not have referred to the same person. Even the witnesses -examined by the defendant, in proving the residence and death of the Kentucky Bush, proved enough to show that he could not. have been the same person who was believed lo have been a refugee and lory; and was suspected
 
 *76
 
 of attacking boats on the Mississippi river,, in connexion with other persons, and of committing other depredations upon society.
 

 The fact that there were two persons of the name of William Bush, may be safely assumed ; and the question arises whether the signature of the Kentucky Bush, as a subscribing witness to the bond, is satisfactorily proved.
 

 Some doubt is attempted to be raised as to this fact, from the statements of the witnesses who lived in the immediate neighbourhood of Bush, and who have no recollection of his Iraving been absent from home about the time the bond bears date.
 

 But this evidence, at best, is of a negative character, and depends upon the memory of witnesses, for a great number of years, of a fact not calculated to make ahy impression on the mind. No circumstances are related by the witnesses which were calculated to impress upon their memories, the absence of William Bush, in January 1787. What prudent person, in the absence of such circumstances, would undertake to state, positively, that his nearest neighbour was absent from home any given month, some twenty-five or thirty years before.
 

 But the complainants have proved by the three sons of Bush and his widow, that he was from home hunting the greater part Df his time ; and some of them say that from his conversations and several facts, they believe he often visited Western Tennessee. And more than one witness, who lived in the neighbourhood of Josiah Payne, became acquainted with Bush in his expeditions to Tennessee.
 

 From these facts it would seem, that no presumption against the due execution of the bond can arise, from the statement of the witnesses who were the neighbours of Bush and who could not recollect of his having been absent from home about the time the bond is dated.
 

 But how can the admissions of Payne, in the presence of Jeremiah and Jacob Coulson, that he held no. instrument of writing on Isaac Coulson for the land in dispute, and that he had agreed to receive a negro boy in discharge of the claim, be explained ; and also his agreement to pay the taxes on the land, and take care of it for the heirs of Coulson1? And what
 
 *77
 
 answer .can be given, to his having received a horse worth 50 dollars, in part payment of the claim
 
 1
 

 ' The payment of the horse seems to have been in pursuance of the original agreement. Two of the witnesses state that Coulson* in addition to the land, was to give Payne a horse worth 50 dollars. And it is not improbable, if the remarks were made by Payne as stated by Jeremiah Coulson, that he held no written contract from Isaac Coulson, they must have referred to the fact, of there being no writing respecting the payment of this horse.
 

 That he agreed to pay the taxes, and preserve the land for' the" heirs of Coulson; is disproved by the fact, that either their •or sometime before, Payne procured a bond from Mrs Coulson for the land. The language of this bond cannot be mistaken; and it goes to show, that instead of abandoning the land and agreeing to pay the taxes for the heirs of Coulson, he was determined to perfect his claim to it, by the use of such means as he could resort to. By the statement of Mrs Coulson, it appears Payne complained that he should have to wait for a title, until her children became of age. This fact, as well as the deed and the whole course of conduct of Payne, show, that he could not have made the remarks and agreement, as stated by Jeremiah Coulson.
 

 From this view of the evidence, which has a bearing upon the fact of the contract and the execution of the bond, the proof is as clear and as satisfactory as could be reasonably expected, after the lapse of so many years.
 

 The hand writing of Bush is proved by the positive testimony of three witnesses, and the consideration of the bond is clearly proved by three other witnesses, all of whom stand without any impeachment of their credit. Conclusive as these facts would seem to be, as to the genuineness of the bond and the consideration on which it was given, there are others equally conclusive.
 

 If no contract between Coulson and Payne had been made, what could have induced the latter to visit Virginia in 1793, and how can the conduct of Mrs Coulson, in executing a bond to convey all her right in the land, with the advice of her brother-in-law, Jacob Coulson, be accounted for. This was about five years after the money was to have been paid, or the'
 
 *78
 
 land conveyed. The circumstances were then known to the partiés, and no. objection seems to have been made either by Mrs Coulson, or the connexions of her deceased husband, to the claim set up by Payne. So far from any objections being made, every thing was done, both by Mrs Coulson and her friends, which they could do, to vest the title for this land in Payne: They applied to the court, and remained in- attendance upon it for three, days, at one. time, under the hope of obtaining the necessary authority to execute the conveyance. And Payne complained of the hardship of being compelled to wait for a title, until the heirs of Coulson became of age.
 

 These are facts established by the evidence, and do they not show beyond controversy, that there was a contract between Coulson and Payne respecting this land
 
 1
 
 and this important point being established,, independent of the bond, the genuineness of that instrument must be extremely probable. Its language agrees with the contract as proved by parol; and several pf the witnesses say the contract was reduced to writing. And in addition to this, the clear proof of the handwriting of Bush the subscribing witness, would seem to be conclusive. Taking into view all the facts and circumstances in favour of the due execution of this instrument, it has been as fully esta-clished as could be expected of any writing of so ancient a date;
 

 But it is objected that this bond has been mutilated, and therefore it must be rejected. It is true that some alterations Have been made on the face of the bond. Thé words North Carolina, or some other words, have been erased, and the word Virginia, in lieu thereof, has been inserted. This alteration would make the bond-read Isaac Coulson, of the state of “Virginia,” and county of Davidson, instead of the state of “ North Carolina,” &c. The signature of Isaac Coulson to the bond seems to have been scratched out and again written.
 

 That these alterations have been made since the death of Payne is satisfactorily proved ; and it is clear that no one having any interest under the bond, could have had a motive to alter it, as seems to have been done. If, by the alterations, the obligation of Coulson had been increased, either as to the time of payment, the sum to be paid, or the number of acres to be conveyed, Payne or his heirs might have had some mo-
 
 *79
 
 live of interest to make them ; but their interest was directly opposed to any act, which would impair the validity of the • bond, or cast suspicion upon it.
 

 It is proved chat, after the death of Payne, the bond was in the possession of those who claimed the land adversely to it; so that its destruction would have advaneed their interests. It is fair, therefore, to presume, that if the alterations were made by design^ they could not have been made by any one claiming under the bond,.but must have been made by some one who had
 
 an
 
 interest in destroying it.
 

 By this bond Coulson agreed to pay to Payne 100 pounds in twelve-months, or in lieu of the money, to convey the land.
 

 It is alleged in the bill that Coulson elected to pay the 100 pounds by a conveyance of the land, and that Payne agreed to. receive it.
 

 This is a clear case of election by the obligor; and a conveyance of the land or the payment of the money, within the time specified, would have discharged the obligation. The money has not been paid; and although there is no positive proof that an election was made during the life of Coulson to pay the land, yet, from the facts and circumstances of the case, and the condition of the obligation, there can be no doubt that those who claim under it have a right to consider it now as an absolute bond for the conveyance of the land.
 

 The statute of limitations is set up as a bar to the relief sought by the bill; and as this is a ground more relied on by the counsel than any other, it requires a most careful exami-'ion.
 

 In the ninth section of
 
 “
 
 an act concerning proving wills, and granting letters of administration, and to prevent frauds in the management of intestates’ estates,” enacted by North Carolina in 1715, and- which is now in force in Tennessee.; it is provided, “ that creditors óf any person deceased shall make their claim within seven years after the .death of such debtor, otherwise such creditor shall be for ever barred.”
 

 Under this st.atute the question arises, whether the representatives of Payne, in asserting their claim to the land in controversy, can be considered creditors
 
 1
 
 Whether, in a case where the relation of vendor and vendee exists, the consideration having been paid, and a naked trust only has descended to the
 
 *80
 
 heir, he can protect himself under this statute, after the lapse of seven years, against a bill for a specific performance.
 

 It is insisted by the defendant’s counsel, that this is not considered an open question in Tennessee ; and that in pursuance of the rule of decision in this court, to adopt the construction given to its statutes by-the supreme court of a state, the question must be considered here also as settled.
 

 The first case, Smith v. Hickman’s Heirs, referred to is in Cooke 330. In this case, the reporter says, “ the bill states that the ancestor of the defendants, sometime in the spring of 1789, executed an obligation to the complainant, binding him to convey six hundred acres of land, within a reasonable time; that the said ancestor died intestaté, in.the year 1791, leaving, the' defendants his heirs at law; and that administration of the personal estate was committed to his wife and two other persons. That the obligation has not been complied with ; and that the defendants refuse to satisfy the same, although there is a large estate descended to them both real and personal. The bill prays for a specific performance.” To this bill the statute of limitations was pleaded in bar.
 

 In their opinion, the court say, “it has been insisted that the complainant is not. a creditor, on account of the demand not being of a pecuniary nature ; but, as it is the duty of this court to examine this point, they feel satisfied that as to that he is within the act. All persons are considered creditors that have demands originating from contracts or agreements.” And in answer to the arguments of counsel, that the statute could have had no reference to . heirs, but to the personal representatives and the personal estate; the court remark, “the only inquiry is, whether it were reasonable that the legislature should think of the situation of heirs,.in respect to the debts of their ancestors and again — “ if no lapse of time can secure the estate thus descended, the peace of society would be much disturbed. Recoveries might be made of one, of many heirs, and suits for contribution must take place.” And further, “it is admiued, in argument, that if is reasonable legatees and distributees should know when they may be at rest.”
 

 From the statement in the bill, it does not appear that the conveyance of any specific tract of land was prayed for, and it would seem'from the fact of the personal representatives being
 
 *81
 
 named in the bill, and an averment that a large estate, both real and personal, descended to the defendants, that the object of the suit could not have been a title, but to subject the property descended to the heir to the payment of the claim. On no other supposition can the language of the bill receive a sensible construction.
 

 If the bill had been filed to-obtain a decree for a title to a specific tract of land, would the administrators have been named in it; and could it have been thought necessary to aver that a large estate, both real and personal, descended to the defendants ?
 

 Whether the heirs inherited any estate, or not, beyond the particular; tract, was wholly immaterial. If they were naked trustees, they could be held responsible as such; and the ad-' ministrators were neither necessary nor proper parties to the suit.
 

 It is true, the language used by the court, in the first quotation above made, is general, and would embrace a case of trust; but such does not appear to have been the case before them. And this fact seems to be clear of doubt,'when the language of the court, from other parts of their opinion, as above quoted, is considered in connexion with the case made in the bill.
 

 The case of Lewis v. Hickman’s Heirs,
 
 2
 
 Tenn. Rep. 317, is also relied on.
 

 In this case the-.bill stated that Hickman, for..a valuable consideration, executed a bond to Hughes for 500 pounds, with condition for the conveyance of a tract of two hundred and seventy-four acres of land, &c.. Hickman died intestate, and his administrator, under a statute authorizing administrators to make deeds, executed one to the plaintiff’s testator, in 'discharge of the bond. It was charged that the deed was not in compliance with the statute, and was therefore void. That a certain Roberts took possession of the land; and, that on account of the defect in the title, a recovery could not be had against Roberts. The object, of the bill was, that the bond might- be set up, and the plaintiff relieved. The statute was pleaded in bar, and the déféndant stated also, “ that- he had distributed the estate among those entitled agreeably to law; and from length of time he was not able to produce his vouchers,” &c.
 

 This was clearly not a case where the plaintiff.prayed a spe
 
 *82
 
 cific performance
 
 ;
 
 and yet it was admitted by the counsel tó be the same in principle, ás the-one above referred to, of Smith v. Hickman’s Heirs.
 

 In Peck v. Wheaton, Mart, and Yerg. Rep. 353, the supreme court of Tennessee say, “ we are.moreover of opinion that the act of 1715, above quoted, will operate as a bar; and that that act is in force, we consider one of the best established positions litigated in our courts.”
 

 This bill was brought to subject the lands which had descended to the defendants, to the payment of the debts of their ancestor; and the court very properly held that the statute was' a good bar. . The complainants were, substantially and technically, creditors. This shows too, that it was the. ordinary course in Tennessee, by bill in chancery, to make the lands descended to heirs liable to the debts of the ancestor.
 

 The case of Armstrong v. Campbell, 3 Yerg. 208, is cited. In the margin, the reporter says, that the only exception to the operation of the statute of limitations is, where the trust is created by express contract, and where the relation of trustee and cestui que trust exists in fact, and pot by implication. But in this case the question did not come directly before the court.
 

 That the statute of limitations is applied, by courts of equity, in all cases where at law it might be pleaded, is a well settled principle. At law, to make the statute a bar, there must be an adverse' possession; and lay analogy'a court of equity, in a similar case, will hold the statute to be a good bar.
 

 But the statute; insisted on as a bar in this caseá does not depend upon possession. It bars a creditor who does not sue . the- heir within sevep years. There can .be -no doubt that the statute applies, where a creditor seeks to make the heir liable for the debt of his ancestor, on the ground that either personal or real property descended to him. And this appears to be the decisión of the supreme court of Tennessee, on the statute. There is nothing in'their decisions referred to, which show that they .have given effect, to the statute beyond, this. By the statute of 1819, which is wholly different in its'language from the act of 1715, a bar is .created, indiscriminately, to suits in equity as well as at law. But this statute doés not govern the case under consideration.
 

 In the case or Hagsard v. Mayfield, 5 Hay. 121, the court
 
 *83
 
 say, “as to the act of limitation of 1715, where is the obligee in such a case as the present barred as against the heir ? He has no demand against the executor when he elects the land ; ■and cannot therefore,be barred.as to him. His demand is only against the heir, and that too in equity, upon a trust to be performed by the heir, who, until performance, holds the land for the obligee ; and lie'is only barrable, as in case of equities, by the lapse of twenty years unaccounted fon” This point was not involved in the case, but the question shows the views of-.the court.
 

 From a careful examination of the cases in which the ninth section of the act of 1715 lias undergone a judicial construction-by the supreme court of Tennessee, we are satisfied that' the question raised in the present case has not been decided. , And this court can have no hesitation in saying, that the complainants in this suit can in no correct sense, claiming as the}7-do a specific execution of the contract, be considered creditors within the meaning of the statute. . They do not seek to subject the lands which descended to the defendant, to the payment of debts contracted by his ancestor, but to divest the naked legal title in favour of an equity clearly established. An equity founded upon a coutract which acknowledged the receipt of the consideration in full, in 1787 ; and, as is proved, the same consideration which wirs paid by the defendant’s father for the land in question': an equity accompanied by a possession of more than twenty years.
 

 Can lapse of time operate to the prejudice of the'complainants'? Have they slept upon their rights'?
 

 In about five years after the conveyance should have been executed, we find Payne in Virginia, endeavouring to procure a title. ’ And at that time he did prove a recognition of his claim by the widow of the obligor, who was the only person, according to the views then entertained, that had an interest in the land, and was capable of entering into a legal obligation. Payne’s visit is repeated to Virginia for the same object, and he sends an agent at another time. In 179S he sells a part of this land ; and in the following year or in 1800, possession is taken under this purchase, and subsequently other purchases are
 
 made;
 
 and the possession of the land under Payne and his representatives, has been continued to the present time. In
 
 *84
 
 1805 Paype died, and this land descended to his heirs at law, several of whom were infants; and it is admitted that until the year 1801, there was no court of chancery in Tennessee, .through which the specific execution of a contract could be enforced. And it is proved that this land has been called Payne’s land for thirty-five years.'
 

 ■ These facts being proved, does the case come within any decision by. the' courts of this country or of England, where the. specific execution of a contract has been refused, on the ground of lapse of time
 
 1
 

 When the condition of the parties, their remote residence from each other, their deaths, the state of the country and its tribunals, are considered ; it would seem that instead of being negligent in the prosecution of the claim for a title to this land, Payne and those who claim under him, have shown more than ordinary diligence. Even after, the death of Payne, we find .-his son and administrator in Virginia endeavouring to procure the title. And at this time, as well as at all times previously, when application was made, the right of Payne was acknowledged.
 

 Under such circumstances this court cannot consider the lapse of time as operating against the right set up by the complainants.
 

 The instruments tíndér which a part of the complainants set up an equity derived from Payne’s heirs are proved; but they cannot be’sanctioned by this court, except where such instruments were executed by the heirs of full age. It is the duty of
 

 ■ the court to protect the interests of minors; and we think the decree of the circuit court in ibis respect, as well .as in every other, is cdrrect; and it is therefore affirmed, with-costs.
 

 This cause came on to be heard on the transcript of the record from the circuit court of the United States for the district of West Tennessee, and was argued by counsel.; on consideration whereof, it is decreed and ordered by this court, that the decree of the said circuit court in this cause be, and the same is hereby affirmed, with costs.