IN THE

# SUPREME JUDICIAL COURT,

IN THE

# COUNTY OF WALDO.

ARGUED AT JULY TERM, 1844.

---

Elisha Chick, Jr. & al. *versus* John H. Pillsbury.

It is sufficiently early to charge the indorser of a promissory note, living in a different State, if a notice of the dishonor, directed to him, be put into the mail within a convenient time after the commencement of business hours of the day succeeding that of the dishonor.

Assumpsit against the defendant, as indorser of a note, of which a copy follows: —

"$500. New York, Nov. 26, 1836.

"Three years after date I promise to pay to the order of John H. Pillsbury, at my counting room in New York, five hundred dollars, value received, with interest at six per cent.

"Tunis Van Pelt."

The note was indorsed by the defendant, and the defence set up was, that no legal and sufficient notice was given of the non-payment of the note by the maker, to make the defendant liable as indorser.

From depositions in the case it appears, that the note was protested for non-payment by the maker in the city of New York, on Nov. 29, 1839; that the notary made out a notice to the defendant of the non-payment on the same day, and

handed it to the agent of the plaintiffs; that on the next day, Nov. 30, 1839, the notice, directed to the defendant at his residence, Bangor, Maine, was put into the postoffice in the city of New York, "between twelve o'clock at noon and eight o'clock at night;" that at that time there was but one mail each day from the city of New York, by which letters would go to Bangor; and that this mail went out at seven o'clock in the morning of each day, no letters being carried by it which were put into the office after six o'clock on the same morning. It did not appear at what time of the day the demand was made upon the maker.

*W. G. Crosby,* for the plaintiffs, contended, that the principle to be deduced from all the authorities was, that notice to the indorser, if not sent on the day of protest, should be by the first practicable or convenient mail of the next day. *Whitwell* v. *Johnson,* 17 Mass. R. 449; 3 Kent, 106, and notes and cases cited; Story on Bills, § 290, and note and cases cited.

In this case the mail which left on the thirtieth of November, closed at six o'clock in the morning, and was indeed the mail of the twenty-ninth. But the plaintiffs were under no necessity to send by the mail going out at seven, as they could not prepare their notice and send it out at that unseasonable hour.

*A. G. Jewett,* for the defendant, contended that the defendant was not liable, as the notice was not put into the mail, to go out until the second day, although there was a mail every day. This is not enough. The notice must be put into the postoffice in season to go by the mail of the next day, however early it may set out. 2 Wheat. 373; 1 Mason, 180; 17 Maine R. 383; 1 Pick. 405; 12 Mass. R. 403; Chitty on Bills, 289 and 365; 3 Campb. 193; 1 T. R. 168; 6 East, 12; 3 C. & P. 250; 18 Maine R. 294; 20 Johns. R. 381; 9 Peters, 33; 10 Johns. R. 492; 15 Maine R. 70 & 263; 2 Peters, 106; 6 Wheat, 102; 8 Pick. 54; 4 Wash. C. C. R. 468.

The opinion of the Court, SHEPLEY J. dissenting, was drawn up by

WHITMAN C. J. — This is an action against an indorser of a promissory note, who contends, that he has not been seasonably notified of its having been dishonored by the maker. The note became due in the city of New York, on the twenty-ninth day of November. The mail closed there, daily, at six o'clock in the morning for Bangor, the residence of the defendant. According to the evidence, it seems, that the notice of the dishonor of the note was not put into the postoffice at New York until the latter part of the next day, being the 30th of November; and therefore not in season to go before the morning of the first of December. The question is, was this reasonable notice. It is not a little singular, that a question of this kind should, to this day, have remained in doubt.

It was said in the books, formerly, that where the parties lived in different towns, between which a regular post was established, the notice of dishonor should be despatched by the next post. It was next held that it should be sent by the next practicable mail; and, subsequently, as early as by the mail of the next day; and this has been supposed by some, to mean by such mail, however early in the morning it might start. In *Goodman* v. *Norton*, 17 Maine R. 381, it was held that the notice of dishonor must be put into the postoffice on the day of the demand upon the maker; or in season to be sent by the first mail of the succeeding day. The circumstances in that case were almost, if not quite, identical with those in the case before us. The mail in that case left New York, daily, at six o'clock in the morning. On the 27th of November a note fell due, and was dishonored. Notice of the non-payment was not put into the postoffice till the next day, and after the morning's mail left. Although there was testimony in that case, that notice, so given, was according to the usage of the banks in that city; yet the indorser was held to be discharged. And in *Beckwith* v. *Smith*, 22 Maine R. 125, Mr. Justice Shepley, in delivering the opinion of the Court, recognized the same principle as the rule of law. These

decisions we are now called upon to revise; and, although
supported by numerous dicta to be found in elementary treat-
ises and reports, yet, if erroneous, we cannot hesitate to do so;
especially in reference to a point of such extensive application.

It must be admitted to be of infinite importance, in this
commercial age, that decisions, in reference to what constitutes
due notice of the dishonor of bills of exchange, and promis-
sory notes, should be the same throughout communities, which
are in the habit of circulating and interchanging such paper;
so intimately connected as it is with extended negotiations in
trade. All laws affecting commercial pursuits should, as near
as may be practicable, partake of the character of international
law. Between the United States and Great Britain, a uni-
formity of usage, in whatever concerns negotiable paper, is
highly important. In both countries the principles of the law
merchant are derived from one and the same source. In the
United States, in an especial manner, it is all important, that
there should be the same rule prescribing what shall be legal
notice in the case of dishonored paper. If the decision of
this Court has failed of conforming to what, in the other
States, would meet with sanction in their judicial tribunals,
it will be highly proper that we should take the earliest
opportunity to consider further of the subject. It is evident
that the tendency has been, of late, so to extend the time for
giving notice, that some approximation, at least, may be made
to the establishment of a rule in such cases, which shall be
readily understood, and easily applied; and as nearly applica-
ble to all cases as possible.

In *Whitwell & al.* v. *Johnson,* 17 Mass. R. 449, Mr. C.
J. Parker says, "After some doubts, and looking into authori-
ties, we are satisfied, that it was not necessary for the plaintiff
to show, that notice to the indorser was put into the mail on
the same day the note became due." And, again, he says,
in the same case, "the next day is early enough. And if
there should be two mails a day, whether the notice goes by
the first or the second of those mails, we think is immaterial,
provided it was put into the postoffice early enough to go by a

mail of that day." Hence, if the notice need not be put into the postoffice till the next day, it could not, it would seem, be required to put it in at an unseasonable hour of that day. Six o'clock in the morning of the thirtieth of November would be by break of day, and earlier than it could be expected, of men of business, in our commercial seaports, to be stirring, and therefore at an unseasonable hour. In the *Bank of Alexandria* v. *Swan*, 9 Peters, 33, the notice of dishonor was put into the postoffice at Alexandria on the day succeeding that of the dishonor. The mail left there some time in the night, and generally between twelve and two o'clock for Washington, to which place the notice was despatched, in time to be delivered at eight o'clock in the morning. In strictness the mail, which left in the night after the dishonor, was the mail of the next day; but the Court held the notice was forwarded in due season. In *Geill* v. *Jeremy & al.* Moody & Malkin, 61, Lord Tenterden said, "In these cases it is important to have a fixed rule, and not to resort to nice questions of the sufficiency, in each particular case, of a certain number of hours or minutes. The general rule is, that the party need not *write on the very day* that he receives the notice. If there be no post on the following day, it makes no difference. The next post after the day, on which he receives the notice, is soon enough." In *Firth* v. *Thrush*, 8 Barn. & Cres. 387, the attorney of the holder could not, at first, find out the residence of the party to be notified. At length, ascertaining it, he took one day to consult his client; and on the third day despatched notice, and it was held sufficient, upon the ground that he might be regarded in the light of a bank, holding a bill for collection. In which case it had been held, that the bank need not notify the owner till the day after the dishonor; and that the owner was entitled to still another day to despatch his notification to his indorsers. In *Wright* v. *Shawcross*, 2 B. & Ald. 501, it was held that a person, receiving notice on Sunday, was not bound to open it till Monday, and that notice by the post of the following Tuesday evening, instead of that of Monday evening, was

sufficient. In *Hawkes* v. *Salter*, 4 Bing. 715, Mr. C. J. Best, in reference to notice of the dishonor of a bill, which took place on Saturday, at a place at which the mail left at half-past nine o'clock in the morning of each day, expresses himself to be decidedly of opinion, that notice by the mail of the following Tuesday morning would be seasonable. This must have been upon the ground that Sunday, being no day of business, the next business day was Monday; and that it was not reasonable to require notice to be despatched by the mail, which left at half-past nine o'clock on Monday morning. *A fortiori* if it had closed at six o'clock in the morning, as in the case at bar, it would have been unreasonable to have required notice to have been despatched by it. In *Freeman's Bank* v. *Perkins*, 18 Maine R. 292, Mr. C. J. Weston says, " on the day of the maturity of the bill he, (the holder for collection,) caused it to be protested for non-payment, and notices to be forwarded to the drawer, indorser and acceptor, *which were mailed the next day;* and this was using all the diligence, which the law requires." If it was sufficient that the notices should be *mailed* the next day, it would seem to follow, that it could not be required to be done at an unseasonable hour of that day, and by break of day in the morning or before. But the case, most directly and explicitly in point to show, that notice need not be put into the postoffice till the next day after dishonor, nor then until after the commencement of business hours, is to be found in the first of Hill's New York Reports, p. 263, *Howard* v. *Ives*. Mr. Justice Cowen, in delivering the opinion of the Court in that case, says, " the holder is never required to *mail notice* to his indorser the very day on which default is made in payment." " Here the protest being on Saturday the notice was properly mailed on the next Monday." " Mailing in season for either of the two mails on Monday was sufficient." " It is not necessary to say, that, in all cases where there are several mails on the same day, the party may elect by which he will send. Clearly he comes to the mark, when he selects that post which leaves

next after the hours of business commence for the day. This is the next practicable or convenient post."

In Kent's Commentaries, (vol. 3, p. 106,) the author lays down the law to be, " That if the third day of grace be on Thursday, and the drawer and indorser reside out of town, the notice may indeed be sent on Thursday, but must be put into the postoffice on Friday, so as to be forwarded as soon as possible thereafter." And again, (same page) " It seems to be now settled, that each party, into whose hands a dishonored bill may pass, shall be allowed one entire day for the purpose of giving notice." And it was so held in *Bray & al.* v. *Hadwin*, 5 M. & S. 68. In a note in Kent's Commentaries, (vol. 3, p. 107, 4th Ed.) the author says, " The rule in *Lenox v. Roberts*, 2 Wheat, 373, was laid down too strictly, when it stated that the demand of payment should be made upon the last day of grace, and notice of the default be put into the postoffice early enough to be sent by the mail of the succeeding day." And, although this decision was spoken of with approbation in the *Bank of Alexandria* v. *Swan*, 9 Peters, 33 ; yet " that the decision only is, that notice need not be put into the postoffice on the day of the default." And again, (same page) " That this principle will sustain the rule as now generally, and best understood in England, and the commercial part of the United States, that notice put into the postoffice on the next day, *at any time of the day*, so as to be ready for the first mail that goes thereafter, is due notice."

In Story on Bills, § 288, it is laid down, " That if the post or mail leaves the next day after the dishonor, the notice should be sent by that post or mail, if the time of its closing or departure is not at *too early an hour* to disable the holders from a reasonable performance of the duty." And again, (§ 290) " He, the holder, is always allowed by law a whole day for this purpose." Under this last section, in a note, he makes a long extract from Chitty on Bills, in which this passage occurs. " Another reason is, that the holder ought not to be required, *omissis omnibus aliis negotiis*, to occupy himself immediately in forwarding notice to the prior parties, when by

delaying that step till the next morning, he would, after the pressure of other business had subsided, have in the evening, or *early the next morning*, before the general business commences, time to look into his accounts with the other parties." This author is again quoted in the note as saying, in another part of his work, that notice must be sent off by the post of the next day, whether it goes early or late. Upon this passage Judge Story remarks, "It appears to me the rule is not so strict as it is laid down in this last passage of Mr. Chitty, and that it would be more correct to say that the holder is entitled to one whole day to prepare his notice, and that therefore it will be sufficient if he sends it by the next post, that goes after twenty-four hours from the time of the dishonor." This shows what this learned author understands by one whole day, so often repeated, in the cases upon this point. And it may be difficult to affix any other understanding or meaning to that phraseology. Judge Story, however, admits that in this he is supported by the authority of no adjudged case directly ; but thinks it results from the authorities on the subject. That Mr. Chitty's last quoted sentence is liable to exception, is manifest from the preceding quotation from his work ; for the latter cannot be reconciled with the former, or with the adjudged cases.

The authorities, cited on the part of the counsel for the defendant, are numerous, tending to show that the notice to drawers and indorsers, not resident in the places where the holder of their dishonored paper may live, should be given as early as by the mail of the next day, and some of them, such as the *dictum* in the last extracts from Chitty, and the cases of *Goodman* v. *Norton*, and *Beckwith* v. *Smith*, seem to go the length of holding that notice should be given by the mail of the next day, however early it might start. But the question pending in the reported cases, generally, was whether the notice should be sent the same day, or by a mail of the succeeding day, and did not present the question whether it should be sent by the mail of the next day, however early it might start, or by a later mail, or a reasonably practicable mail.

In a late case, *Chouteau* v. *Webster*, 6 Metc. 1, it appears a note was protested in New York, at 3 o'clock, on the afternoon of one day ; and that the notice of dishonor was despatched to the indorser, by being put into the postoffice in New York for him on the next day. Mr. C. J. Shaw, in delivering the opinion of the Court in that case, says, it is admitted, " that notice thereof (of the dishonor) in due form was seasonably prepared by the proper officer, and put into the postoffice." Nothing is said in the case as to the hour of the day when the mail was made up to convey the notice to the defendant, nor of the precise time of the day when the notice was put into the postoffice. If either had been deemed material, surely it would have been alluded to, either in the statement of the case, or in the arguments of counsel. It could not well have escaped the notice of the counsel for the defendant, aided as he must be believed to have been, by the superior legal knowledge of the latter.

A majority of the Court is, therefore, brought to the conclusion, that the weight of the more modern authorities, both in England and America, is decidedly in favor of a rule of a more convenient and reasonable operation. It may not go to the extent of allowing at least twenty-four hours for the purpose of despatching notice, though it might tend to certainty and precision if such were the case. It seems to be without question, that it extends to the allowance of a convenient time after business hours of the next day after the dishonor, shall have commenced, to prepare and despatch notice. To the decision of this cause it is not necessary to consider whether the rule should extend further or not. The notice was mailed in season to go by the next mail, which left after the business hours of the day, succeeding that of the dishonor, had commenced.

The action, therefore, as agreed by the parties, must stand for trial upon other grounds.

The following reasons for his dissent were given by

SHEPLEY J. — It is without doubt desirable, that there should be an uniformity in the decisions of judicial tribunals

in different commercial countries and states, respecting the
duties and liabilities of holders and parties to dishonored paper.
It is also of the first importance in a commercial community,
that notices to the parties liable on such paper should be com-
municated as early, as they reasonably can be; that such
parties may be enabled to obtain security from those liable to
them, and that they may not be called upon to pay such paper,
after they have had reason to conclude, that the party first
liable has paid it, and have therefore employed their funds in
other business.   When the party to be notified does not reside
in the same place, the holder, if he does not send notice by
the post, should despatch it as early as during some hour of
the day following the day of its dishonor.   He cannot permit
that first day after its dishonor to pass, before he does it, with-
out being guilty of laches, and thereby forfeiting his right to
call upon him.   He cannot therefore merely prepare the notice
on that day, and put it into the hands of an express, and allow
that express to remain without moving until the second day
after the dishonor.   The law permits him to make use of the
post for the conveyance of that notice.   But he must not claim
thereby to extend or prolong the time allowed him to put the
notice in motion.   And there is no more reason for allowing
him to put his notice into the post on the day following that of
the dishonor, after the latest post of that day has departed,
where it must remain until the second day, than there would
be to allow him so to conduct with it, if he forwarded it by an
express.   And if there be an inconvenience occasioned by the
departure of the post early in the morning, it is more reason-
able and just, that he should be subjected to it, than that the
rule should be violated requiring the notice to be despatched
during the day following that of the dishonor of the bill, to
the delay and injury of the other party.   This rule does not
require any thing unreasonable of the holder.   He may cause
the paper to be presented, as early as he pleases during the
business hours of the day, on which it becomes due; and if
the post should leave on the following day, before business
hours, there is surely sufficient time after the presentment for

him or his notary to make out the notice or notices, and place them in the postoffice in season for that post. A Judge, perceiving that the holder, if such strict conformity to rule be required of him, is likely, in some one case, to lose his money, . may be tempted to extend the rule to embrace the case. But to yield to the pressure of circumstances would never be either creditable to the judicial tribunal, or useful to the community. The general mischief is ever greater, than the particular benefit.

Mr Justice Bayley, in his treatise, states the rule to be, that "to such of the parties, as reside in the place, where the presentment was made, the notice must be given at the farthest, by the expiration of the day following the refusal; to those, who reside elsewhere, by the post of that or the next post day." Bayley on Bills, 2d Am. Ed. 262. Mr. Chitty, in his treatise, says, " the rule is now well settled, that the holder must, in order to subject all the parties to actions at his suit, give or forward all his notices to every one of the indorsers and to the drawer, whose residence he can ascertain, on the day after the bill or note was dishonored." Chitty on Bills, 8th Am. Ed. 514. And on page 516 he says, " when the parties do not reside in the same place, and the notice is to be sent by the general post, then the holder, or party to give the notice, must take care to forward notice by the post of the next day after the dishonor, or after he received notice of such dishonor, whether that post sets off from the place, where he is, early or late." These are the two most approved treatises on the subject. They are the hand books of the merchants, the bankers, and the notaries of Great Britain and of the United States; and being their guides, they shew the actual and accustomed course pursued in both countries. These persons cannot be expected to obtain their information from the numerous judicial decisions, which are the sources of information for professional men. And that course must be expected to be pursued, although there may be found opinions not in accordance with those rules. It would be a little remarkable, if the two treatises most approved and generally used by the mercantile community should be found to agree in

stating the law erroneously, thereby leading that community into dangers and difficulties instead of guiding it safely. A conclusion, that they are justly chargeable with such results, should be formed with reluctance; for its tendency would be little suited to promote uniformity either of rule or of practice. To determine this matter it will be necessary to examine the cases supposed to be in conflict with the rule stated by them; and some of the leading cases from which it was derived. In the case of *Tindal* v. *Brown*, 1 T. R. 167, the rule was stated to be, "the holder must write by the next post after the bill is dishonored." In the case of *Darbishire* v. *Parker*, 6 East, 3, this rule was recognized as correct; but Mr. Justice Lawrence expressed an opinion, that if the post should depart so early after receipt of the intelligence, that it would be inconvenient to require a strict adherence to the rule, it would not be reasonable to require the notice to be sent before the second post. In the case of *Scott* v. *Lifford*, 9 East, 347, the holder placed the bill in the hands of his banker, who presented it in London, and it was dishonored on June 4. On the 5th, they returned it to the plaintiff, also residing in London, who put a notice directed to the defendant, residing at Shadwell, into the two-penny post on the 6th. This notice was decided to be sufficient on the ground stated by Mr. Justice LeBlanc, that "it cannot be contended, that a banker ought to give notice of the dishonor to any but his customer, for whom he held the bill." In this case the holder, in accordance with the rule, put his notice into the post of the next day after he received intelligence from his banker, that the bill had been dishonored. In the case of *Langdale* v. *Trimmer*, 15 East, 291, the bill was presented at a banking house in London, and was dishonored on February 25. The party, supposing that it might have been presented too early on that day, presented it again on the 26th, and on the same day returned it to the plaintiffs, who gave notice to the defendant, residing at Farnham, by a letter in the post of the 27th. In this case the banker was not obliged, according to the rule, to notify the first dishonor until the 26th; and on that day the notice was given, and no time

was claimed on account of the second presentment on that day. And the plaintiffs gave notice to the defendant by the post of the day following that, on which they received intelligence, that it was dishonored. Lord Ellenborough said, the plaintiffs " were not bound to lay aside all other business and send notice of the dishonor on the same day after five o'clock, but might return it by the post of the next day, after they had received it." In the case of *Williams* v. *Smith*, 2 B. & A. 497, Abbott, afterward Lord Tenterden, fully considered the question, and established a rule, which he designed to be free from all difficulties in practice. It so far varied from the one laid down in the earlier cases, as not to require in any case the notice to be actually sent by the post departing after the dishonor and on that day, and requiring it in all cases to be sent as early as by the post of the following day. After speaking of the great importance of some plain and precise rule as to the time, within which notices of the dishonor of bills must in all cases be given, he says, " that time I have always understood to be the departure of the post on the day following that, in which the party receives the intelligence of the dishonor." And it should be noticed, that this variation appears to have been made, as Mr. Chitty states, on page 515, to avoid the difficulties alluded to by Mr. Justice Lawrence respecting an early or late departure of the post, and for the purpose of settling upon a rule so certain, that no such question or difficulty could arise for the decision of a jury. And this rule is believed to have remained, as the settled rule in England without change or modification, except in two particulars. And those seem rather to be the necessary results of the application of the rule, than a variation of it. These are, first, that Sunday is not to be regarded as a day for business. So that if intelligence of dishonor be received on that day, it is to be considered as received on Monday. And if the dishonor, or intelligence of it, take place, or be received on Saturday, Monday is to be considered, as the day following. And second, that if there be no post departing on the day following the day of dishonor, or

intelligence of it, the notice must be sent by the next post after that day.

The cases will now be examined, which have been supposed to authorize the party, in certain cases, to postpone sending the notice until the post departing on the second day after the bill has been dishonored, or intelligence of it has been received. In the case of *Haynes* v. *Birks*, 3 B. & P. 599, the bill was presented by the bankers of the plaintiff in London and dishonored on Saturday, October 1. On Monday the 3d, the bankers sent intelligence of it to the plaintiff, residing at Knightsbridge, who gave notice to the defendant, residing at Tottenham Court Road, on Tuesday the 4th. Lord Alvanley said, " it was impossible for the bankers on Saturday night to give notice to the plaintiff, since the bill was not presented till between nine and ten o'clock. On Sunday, of course, they were not bound to do so. And on Monday they did apprise the plaintiff of the non-payment." Except that he did not account Sunday to be a business day, he insisted upon a more strict performance in theory, than the rule, as before stated, required ; for he said the plaintiff " certainly was bound to write by the two-penny post on Monday, and supposing him to have done so, the defendant would only receive his letter on Tuesday." In the case of *Bray* v. *Hadwen*, 5 M. & S. 68, the plaintiffs, residing at Tavistock, paid into their bankers at Launceston a bill on London, which was dishonored. Their bankers received notice of its dishonor at Launceston on Sunday morning at half-past eight o'clock, July 17. The post left that place for Tavistock at twelve o'clock on the Monday and Tuesday following. The bankers put a notice for the plaintiff into the postoffice at Launceston, on Monday, after the post for that day had departed, which was conveyed by the post of Tuesday. It was insisted, that they should have sent by the post of Monday. The decision was, that the bankers were not obliged to open their letter on Sunday ; and as they were to be considered as receiving intelligence of the dishonor on Monday, the notice sent by the post of the following day was in season. And this was strictly in conformity

to the rule. The case of *Wright* v. *Shawcross,* is stated by the reporter, in a note to the case of *Williams* v. *Smith,* before noticed, 2 B. & A. 501. The bill was presented and dishonored in London, on April 3, 1817. By the post of the 4th a notice was sent to the plaintiff, which was received by him on Sunday the 6th. And he sent a notice to the defendant by the post of Tuesday evening. It was contended, that he should have sent it by the post of Monday evening. The decision was that the plaintiff was not bound to open his letter before Monday, and receiving intelligence as of Monday, the notice by the post of the following day was in season. This also was in conformity to the rule.

The case of *Bancroft* v. *Hall,* 1 Holt, 476, is not opposed to the rule. It was decided by Mr. Justice Bayley on a different ground from that of extending the time for giving notice. The bill was presented and dishonored in London, and the plaintiff, residing in Manchester, received intelligence of it on May 24; and on that day despatched a letter by a private hand to his agent in Liverpool, where the defendant resided, requesting him to give the notice. This letter was received by the agent in the afternoon of the 25th, who " went about six or seven in the evening to the counting house of Hall, but after knocking at the door and ringing a bell, no one came to receive a message. The merchants' counting houses at Liverpool do not shut up till eight or nine. The 26th was Sunday; and notice was not in fact given till the morning of the 27th." Mr. Justice Bayley said, " Here the notice reaches Liverpool on the 25th. No expedition could have brought it earlier." He also said, " It was the defendant's fault, that he did not receive notice on the 25th; which he might have done, if he had kept his counting house open till eight or nine, which are the customary hours of closing at Liverpool." This is but a decision, that the plaintiff had performed his duty by causing his agent to call at his place of business during business hours to notify him on the 25th. The case of *Firth* v. *Thrush,* 8 B. & C. 387, instead of being opposed to it, distinctly affirms the rule. The bill was dishonored on August

4, 1826, and the holder employed his attorney to ascertain the residence of the defendant. The attorney obtained that information on October 16, and on the 17th consulted his client, and on the 18th, sent the notice to the defendant. The question made was not, whether the rule should be so varied as to allow a notice from the holder on the 18th to be in season; but whether in analogy to the rule allowing a banker a day to return a bill to his customer, the attorney should be allowed a day to consult his client. And Lord Tenterden so states. He says, " the question is, whether he was entitled to take a day to consult his client?" He gives his reasons for deciding, that he had a day; and says, " *if the letter* [giving information of the defendant's residence] *had been sent to the principal, he would have been bound to give notice on the next day.*" The other Justices concurred in these opinions. And the rule is rather affirmed, than varied, by the case of *Geill* v. *Jeremy*, 1 Moody & Mal. 61. The plaintiff received intelligence of the dishonor by the post at nine o'clock in the morning of Thursday, August 31. The post left his place of residence for London, where the defendant resided, at six o'clock that evening. There was no post on Friday. And the notice was sent by the post of Saturday. The point decided was, that when it becomes impossible to execute the rule because there is no post on the day following the receipt of the intelligence of dishonor, a notice sent by the next post will be in season. Lord Tenterden said, " the general rule is, that the party need not write on the very day, that he receives the notice. If there be no post on the following day, it makes no difference." This is evidently said in answer to the argument, that the plaintiff should have sent the notice by the post of Thursday evening. He then states the ground, upon which the case was decided, that " *the next post after the day, on which he receives the notice, is soon enough.*" The case of *Hawkes* v. *Salter*, 4 Bingh. 715, is the only one found, in which a different opinion has been expressed. In that case the bill was presented and dishonored at Norwich, on Saturday, January 7, 1827. The defendant resided near North Walsham, and the post for that

place left Norwich at half past nine o'clock in the morning. The testimony of a witness stated, that a letter giving notice to the defendant, was put into the post by himself or another clerk, to be sent by the post of Tuesday morning, the 10th. The reporter states, that "Best C. J. expressed himself clearly of opinion, that it would have been sufficient, if the letter had been put into the post, before the mail started on the Tuesday morning; but that there was no sufficient evidence, that it had been put in even on Tuesday morning." It is worthy of notice, that this opinion did not affect the rights of any one. That it was but the expression of an opinion, which decided nothing. Such appears to be the law as exhibited by the English cases, presenting, with a single exception, an uniform and unbroken current of authority in support of the rule laid down in the works of Bayley and Chitty.

And such was decided to be the rule of law in the United States, by the Supreme Court in the case of *Lenox* v. *Roberts*, 2 Wheat. 373. In the case of the *Bank of Alexandria* v. *Swan*, 9 Peters, 33, that case was named as stating the rule correctly. And this last case is in conformity to and not opposed to the rule. The note was presented by the notary of the bank, and was dishonored, at Alexandria on August 25, 1829. The jury found a special verdict, which states, "we find, that the 26th day of August, 1829, and long before the closing of the mail of that day at Alexandria, that Benjamin C. Ashton, on behalf of the said bank, put into the postoffice at Alexandria, a letter written by him, addressed to the defendant at Washington." The letter being produced, was found to be post marked at Alexandria on the 26th. And no one is at liberty to allege, contrary to the special verdict, that the notice was not sent by the mail of the day following the day of dishonor.

The decided cases shew, that the same rule prevails in the State of New York. It was so laid down in the case of *Smedes* v. *Utica Bank*, 20 Johns. R. 382. In the case of *Mead* v. *Engs*, 5 Cow. 303, the rule is even more strictly stated. In the case of *Howard* v. *Ives*, 1 Hill, 263, the point

decided was, that when a bill is dishonored on Saturday, Sunday not being a day of business, Monday is to be considered as the day following the day of dishonor, and that notice by either mail of Monday, if there be two, was in season. This was no new doctrine, but in accordance with the rule and with the English cases. The facts were, that the bill was presented and dishonored in the city of New York, between the hours of three and five o'clock, P. M. on Saturday. The plaintiff, a party to be notified, resided at Troy. The mail left New York for Troy on Sunday; and on Monday at half past five o'clock, A. M. and at five o'clock P. M. The notary put into the post-office in New York, a notice to the plaintiff in season for the mail, which left on Monday at five o'clock, P. M. This notice the plaintiff received at Troy on Tuesday, at eight o'clock, A. M. and on the same day he put into the postoffice at Troy a notice directed to the defendant residing at Lansingburg. It was contended, that the notice should have been sent to the plaintiff by the mail of Sunday, or by the mail of Monday morning. It was decided otherwise in perfect conformity to the rule. The former cases were cited with approbation; and there is no indication of an intention to vary the rule laid down in them.

The same rule appears from the decided cases to have prevailed in Massachusetts. The point particularly presented in the case of *Williams* v. *Johnson,* 17 Mass. R. 449, was, whether it was necessary, that the notice to the indorser should have been put into the postoffice on the day of the dishonor, or on the day following, in season for the mail of the day. The decision was, that it would be in season to place it in the office on the day following that of the dishonor, "*provided it was put into the postoffice early enough to go by a mail of that day.*" In the case of *Shed* v. *Brett,* 1 Pick. 401, it is said, that notice may be given immediately after the paper has been dishonored, " though it is not necessary, it should be given until the day after, *or if the indorser is in another town, by the next mail after the day, on which the demand is made.*"

In the case of *Talbot* v. *Clark,* 8 Pick. 54, Parker C. J. says, "The law is entirely settled here, in England, and in New York, that notice must be sent by the next day's mail after knowledge of the dishonor of a bill."

It does not appear that any such question was presented or decided in the case of *Chouteau* v. *Webster,* 6 Metc. 1.

The rule was decided to be the law in this State in the cases of *Goodman* v. *Norton,* 17 Maine R. 381, and in *Beckwith* v. *Smith,* 22 Maine R. 125.

The rule of law is differently stated by Chancellor Kent. 3 Kent, 106. He requires the notice to be put into the office on the day following the day of dishonor, or that of the receipt of intelligence of it; but does not require to be put into the postoffice in season to be conveyed by the post of that day. And in a note he states, that to be the rule " now generally and best understood in England and in the commercial part of the United States." The origin of this opinion may be found in a note to that page, where he says, "In *Hawkes* v. *Salter,* 4 Bing. 715, and *Bray* v. *Hadwen,* 5, M. & S. 69, and *Geill* v. *Jeremy,* 1 Moo. & Mal. 61, it was held, that the holder had in such case [if the demand be made on Saturday,] the whole of Monday *to write the notice,* and that a letter by the Tuesday morning's post was sufficient." These cases have already been examined, and the first one only has appeared to sustain the position. And the position, that the notice need not be sent until the post of the second day after the day of dishonor, or the day of the receipt of intelligence of it, is very objectionable ; as well as opposed to the uniform current of authority, a single case excepted. If it were adopted and applied between the cities of Boston and Portland, the effect might be to permit the holder to delay sending a notice to the indorser until the fourth post after the paper had been dishonored. Apply the position to a supposed case. The mail leaves Boston for Portland twice each day, at seven o'clock, A. M. and at three o'clock, P. M. The bill is presented and dishonored in Boston at twelve o'clock on Monday, the notice, if put into the postoffice in Boston too late on

Tuesday for the last mail of that day, will be conveyed to Portland on Wednesday by the fourth mail after the bill was dishonored. This would permit a delay unnecessary for the holder, injurious to the indorser, and authorized by no decided case.

Mr. Justice Story, in the case of *Mitchell* v. *Degrand*, 1 Mason, 180, said, "when a bill is once dishonored the holder is bound to give notice by the next practicable mail, to the parties whom he means to charge for the default." And the case of *Lenox* v. *Roberts*, was referred to in a note as authority. In section 290 of his treatise on bills, he states the rule as Bayley and Chitty do, with the exception of making, in section 291, the day allowed to each party to consist of twenty-four hours after the bill has been dishonored, or intelligence of it received. In a note, where he doubtless felt at liberty to suggest improvements in the law, after quoting the language of Chitty, stating the rule, he says, "it appears to me, that the rule is not so strict, as it is laid down in this last passage of Mr. Chitty; and that it would be more correct to say, that the holder, is entitled *to one whole day to prepare his notice*, and that therefore it will be sufficient, if he sends it by the next post, that goes after twenty-four hours from the time of the dishonor. Thus, suppose the dishonor to be at four o'clock P. M. on Monday, and the post leaves on Tuesday at nine or ten o'clock, it seems to me, that the holder need not send by that post, but may safely wait, and put the notice into the post-office early enough to go by the post on Wednesday morning at the same hour. I have seen no late case which imports a different doctrine; on the contrary they appear to me to sustain it. But as I do not know of any direct authority, which positively so decides; this remark is merely propounded for the consideration of the learned reader." These two very distinguished jurists, will not claim to be exempted from liability to error. While they agree, that the holder has one whole day merely to write or prepare his notices, they disagree as to what shall be considered a whole day. One holding it to be the natural day following the day of dishonor or notice of it;

and the other twenty-four hours after those respective events. They both appear to have been led by a somewhat inaccurate use in the books and in legal opinions of the terms, "his day," "an entire day," and "a whole day," to the conclusion, that these phrases were to be understood literally. That such was not the intention of those, who introduced and used them, could, it is believed, be made apparent by one having sufficient leisure for such an examination. If those phrases were to be literally understood, and a rule to be derived from them were in all cases to be fully adhered to, the effect would be to contradict, break down, or vary, several other well settled rules. Such a construction would require the rule now under consideration to be varied in a manner yet to be ascertained, because the time, which shall constitute the day, remains to be settled. It would also contradict and require a variation of the well established rule, relative to the mode of giving notice, when all the parties reside in the same place. "When the parties reside in the same town the holder, or other person to give notice, must, on the day after the dishonor, or on the day after he received the notice, cause notice to be actually forwarded by the post, or otherwise, to his next immediate indorser *sufficiently early in the day, that the latter may actually receive the same before the expiration of that day.*" Chitty on bills, 515; Story on Bills, § 291. It would have the like effect upon another rule equally well established, that when notice is to be given in the place, where the bill has been dishonored, to persons or corporations known to be accustomed to close their places of business at a certain hour of the day the notice should be given to them on the day following the dishonor, before the hour for closing their places of business. Chitty, 516; Story, § 291. When Baron Graham said, in the case of *Bray* v. *Hadwen*, "that each party was entitled to an entire day for the purpose of giving notice," he could not have meant, that the notice need not be put into the postoffice in season to be sent by the post of the day allowed to the party. The plaintiffs in that case received notice of the dishonor on Sunday. For the purpose of business, Mon-

day was considered to be the day of their first knowledge of it. The post left at twelve o'clock. They put the notice in on the evening of Monday. The Baron said, they were entitled to an entire day, and "had the whole of Monday to put in their letter." It is obvious, that this was said in answer to the argument, that it should have been put in before twelve o'clock on Monday to be conveyed by that post. If they had been allowed the entire day following that, on which they were considered as having received notice, they might have placed their notice in the postoffice on Tuesday, after the post of that day had departed, and it would have been in season. It cannot be believed, that Baron Graham would have sanctioned such a course. It is believed, that no more was intended by the use of such phrases, than that each party should have a day to give his notice, taking care to perform that duty at such time during the day allowed him, that the notice shall be actually given to a party residing in the same place at the proper hour of that day, and be sent to a party residing in another place by the post of that day. Thus understood, the rule allowing each party a day, will not be in conflict with any other rule. All the rules will operate in harmony. And this is the sense, in which Lord Ellenborough admitted it in the case of *Smith* v. *Mullett*, 2 Campb. 208. He says, "if a party has an entire day, he must send off his letter conveying the notice, within post time of that day." In the case of *Jameson* v. *Swinton*, 2 Campb. 373, Mr. Justice Lawrence seems to have considered the rule as applicable only, where all the parties resided in the same place. He could not therefore have understood it differently without regarding it as contradicting the well established rule for giving notice in such cases. In that case he says, "This is allowing only one day to each party, which, where the parties all reside in the same town, seems now to be the established rule."

The rule, as propounded for consideration by Mr. Justice Story, to consist of a day of twenty-four hours after the dishonor or notice of it, would be liable to this further objection; that the indorser, after having received notice, would often be

unable to determine, whether he had been notified in season or not, until after he had been able to ascertain the hour of the day, when the presentment was made. And this would be very inconvenient, when the parties resided in different countries, or in distant States. And the holder also would have the power often of affecting the right of the indorser to an early notice, by delaying the presentment until a late hour of the day. Mr. Justice Thompson observes, in the case of the *Bank of Alexandria* v. *Swan*, that "the law, generally speaking, does not regard the fractions of a day." And Lord Tenterden, in the case of *Geill* v. *Jeremy*, says, "In these cases it is of great importance to have a fixed rule, and not to resort to nice questions of the sufficiency of a certain number of hours or minutes." If the proposed day of twenty-four hours should be allowed, it might often become necessary to have a jury determine the hour and moment of presentment to enable the Court to determine, whether the notice was sent by the next post, that left after twenty-four hours from the time of the dishonor. This would be undesirable, and inconvenient.

The proposed change, which would require notice to be forwarded by " the next practicable mail," or " at a convenient time after business hours of the next day," instead of by the post of the next day, is suited to introduce much more inconvenience, than it can obviate.

Is the Court to determine, what was a convenient time after business hours, or which was the next practicable mail, and to do it in each particular case; or is there to be an attempt to make a general rule? If such an attempt be made, is there reason to expect, that any certain and uniform rule can be adopted, and prevail throughout the several States? Business hours, and that, which may be considered to be a practicable or convenient time for forwarding notices by the post, may be very different in different places, and different among different classes of business men in the same place. Banking corporations and houses often establish hours of business differing from those of individuals in the same place. Is the rule to be varied, and conformed to the business habits of each

place, and to those of each class of persons in the same place? The arrangement and hour of departure of the post from a place may be expected to be changed not unfrequently; and no certain rule can therefore be established respecting a practicable mail. If business hours are to constitute an element in the composition, out of which a rule is to be formed, there must be proof of those hours in the city or place, from which the notice has been sent, and a difference in the testimony may be expected from those engaged in different kinds of business; and in such case a jury must decide each case upon the testimony. Many other inconveniences and dangers will present themselves to any one, who duly considers the effect of the proposed change. The rule, as now established, is certain, uniform, easy of comprehension, not difficult of execution, not liable to change by the change of arrangement in the post, or of business hours. The one proposed in all these particulars is defective, and however apparently salutary, if generally received, it cannot fail to be productive of uncertainty, litigation, and loss.

The result of this examination is a conviction, that the rule, as before stated by Bayley and Chitty, is fully established; that it has become the settled law in England and in the United States; that in the application of it in practice, the Lord's day is not to be accounted a day of business or taken into the account; that the rule, that each party has a day to give notice, was never intended to be, and should not be construed so as to be in conflict with any other established rule; that no modern case has been found, which has actually decided the rights of parties upon a different doctrine; and that the only opinions opposed to these positions are those of Chief Justice Best, and Chancellor Kent; Mr. Justice Story, suggesting one rather for consideration, than as exhibiting the law, at the same time admitting, that it is unsupported by any decided case.