LYDIA ANN HAVENS et al.

*v.*

THE SEA SHORE LAND COMPANY.

1. A remainder limited upon an estate tail will be held to be vested, though it is uncertain whether a right to possession will ever vest in the remainder-man.

2. An estate is vested when there is a present fixed right of present or future enjoyment. It is the present capacity of taking effect in possession, if the pos-

.session were to become vacant, that distinguishes a vested from a contingent remainder.

3. All contingent and executory estates, and possibilities coupled with an interest, where the person who is to take is certain, may be effectually conveyed before the contingency upon which they depend takes effect.

4. The *habendum* cannot be used either to enlarge or diminish the estate ·specifically defined in the granting clause of a deed, for if it is repugnant to that clause it is void, but if that clause is silent or ambiguous, then the *habendum* becomes the standard by which the estate granted must be measured.

5. A deed should be so construed as to give effect to the intention of the parties, if by law it may; and if the intention of the parties cannot be carried out in the way they intended, and the law will permit it to be carried out in ·another, that other should be adopted.

6. A deed which has failed of effect as a release, for want of an estate in possession in the releasee, may, if it is founded on a valuable consideration, be given effect as a bargain and sale.

7. Any words that will raise a use, will, with a valuable consideration, amount to a bargain and sale.

· 8. Where the possession of the land conveyed by an ancient deed has accompanied the deed, there, on proof of the antiquity of the deed and that it comes from a proper source, the deed may be admitted in evidence without proof of its execution.

9. But where possession has not accompanied the deed, there, in addition to proof of antiquity and that it comes from a proper source, to justify its admission, such account must be given of it as may reasonably be expected under all the circumstances of the case and as will lead to the belief that it is genuine.

On final hearing on bill, answer and proofs.

*Mr. John L. Conover* and *Mr. Frank P. McDermott*, for the complainants.

*Mr. George Holmes* and *Mr. Isaac W. Carmichael*, for the defendant.

VAN FLEET, V. C.

This is a partition suit. The title to one of the tracts which the complainants seek to have divided is in dispute. The defendant asserts title to the whole tract; the complainants, on the other hand, assert a title to the undivided half of it, but admit that the defendant has title to an undivided fourth and that the title to

the other undivided fourth is in certain other persons. The defendant exhibits a paper title to the whole tract; the important question, therefore, presented for decision is, is the title exhibited by the defendant valid? for if it is, the bill as against the defendant, as to that tract, must be dismissed.

Both parties claim under David Curtis, who died testate between 1783 and 1788. At the time of his death he owned two undivided sevenths of Manasquan Beach, one of which he acquired from Elisha Lawrence, by deed dated July, 1770, and the other from Benjamin Lawrence, by a deed which it is alleged is lost. Among the gifts made by David Curtis by his will there is one which reads, in substance, as follows:

"I give and devise unto my eldest son Elisha that right of beach I bought ·of Elisha Lawrence—to him and the heirs of his body lawfully begotten, and for the want of such heir or heirs, then to be equally divided between my two ·sons John and Benjamin."

David Curtis, besides limiting over to his two sons, John and Benjamin, the land devised to his son Elisha, made John and Benjamin his residuary devisees, and they, as such devisees, took that undivided seventh of Manasquan Beach which had been conveyed to their father by Benjamin Lawrence. The thing in dispute is the one-half of that seventh which David Curtis acquired from Elisha Lawrence, and which he by his will limited over to his son John, in case his son Elisha, for the want of heirs of his body, did not take it. The defendant claims this half and puts forward as the foundation of its title a deed purporting to have been made on the 31st day of May, 1788, by John Curtis to Joseph Lawrence. The whole contest between the parties centres in this deed. If it passed the land in controversy, the defendant will be entitled to prevail in this suit; if it did not, the complainants will be entitled to the decree they ask. The complainants contend, *first*, that the deed has not been sufficiently proved to entitle it to be admitted in evidence; and, *secondly*, that if it was admitted, no effect could be given to it—*first*, for the want of apt words to pass any right or estate which the grantor may have held at the time of its execution; and, *second*, because the grantor

then held no right or estate in the land which he could grant or convey. These questions will be considered in an order directly the reverse of that in which they have just been stated.

It is undisputed that Elisha Curtis, the eldest son of David, died childless, never having had issue of his body. John died before Elisha. Their deaths occurred very near together in point of time, but the proof makes it entirely clear that John died first, so that it was undetermined when John died whether or not Elisha would have issue of his body. As the law stood when the devise to Elisha took effect, it is clear that he took an estate tail in the land devised. Our statute cutting an estate tail down to an estate for life in the first taker, with remainder in fee to the issue of his body, was not passed until 1820 (*Elm. Dig. 130 § 6*), and the devise to Elisha took effect prior to 1788. Chief-Justice Kirkpatrick stated with great clearness, in *Den.* v. *Taylor, 2 South. 413, 417*, what words would be held to be sufficient to create an estate tail. He said: "It is as well settled that a devise to one and his heirs, and if he die without issue, then over to another, creates an estate tail, as if the principal devise had been in the most technical language, to him and the heirs of his body. The words of the devise over—if he die without issue then over to another—limit the generality of the term heirs in the principal devise, and lead us to the inevitable conclusion that the testator intended heirs of the body only, and not heirs generally. And whenever this intention can be collected from the whole will, taken together, let the phraseology in the particular clauses of it be what it may, it has been always construed to make an estate tail." This statement of the law has been so uniformly followed by the courts of this state as to have become a canon of real property law. *Moore* v. *Rake, 2 Dutch. 574, 585*. It is entirely clear that Elisha Curtis took an estate tail in the land in controversy.

This being so, it necessarily follows that the devise over to John and Benjamin, in case Elisha did not have issue of his body, gave them a vested remainder in fee, subject to be defeated by the birth of issue to Elisha. The law is settled, that a remainder limited upon an estate tail will be held to be vested, though it is

uncertain whether a right to possession will ever vest in the remainderman. The decision of the court of errors and appeals in *Moore* v. *Rake, 2 Dutch. 574*, is directly in point, and furnishes an authoritative illustration of the manner in which this principle of law is to be applied. The devise in that case took effect in 1795, and was expressed substantially in this form:

"I give to my son Isaac, his heirs and assigns, all my lands whereon I now live, to hold to him, his heirs and assigns forever, but if my son Isaac should die without lawful issue, then I give all my land to my wife, her heirs and assigns forever."

The testator's son Isaac died in 1843, without issue, never having been married. His mother, the testator's widow, died in 1832, over ten years before Isaac. The controverted question in the case was what estate the testator's wife took under the devise. The court held that she took a vested remainder, and not by way of an executory devise, nor a contingent remainder. Each of the three judges who wrote opinions—Chancellor Williamson and Justices Elmer and Vredenburgh—so expressly declared. Justice Vredenburgh (*p. 586*) gave the following summary of the leading rules distinguishing a vested from a contingent remainder: "An estate is vested when there is a present fixed right of present or future enjoyment. The law favors the vesting of remainders, and does it at the first opportunity. It is the present capacity of taking effect in possession, if the possession were to become vacant, that distinguishes a vested from a contingent remainder. It is the uncertainty of the right which renders a remainder contingent, not the uncertainty of the actual enjoyment. A remainder limited upon an estate tail is held to be vested, though it is uncertain if the possession will ever take place." There can, therefore, be no doubt that John Curtis, by force of the devise to him, took a vested remainder in fee in the land in controversy, and it is equally certain, if such was the character of his estate, that he had good right and full power to make an effectual conveyance of it during the life of his brother Elisha.

If a different conclusion had been reached as to the nature of John's estate, and it had been found that the remainder limited

24

to him was contingent, still I think the court would have been bound to declare, in conformity to the well-settled law on this subject, that he had full power, during the life of Elisha, to make an effectual conveyance of his estate in the land, though it was uncertain whether such estate would ever vest in possession. All contingent estates of inheritance, or possibilities coupled with an interest, where the person who is to take is certain, may be conveyed or devised before the contingency on which they depend happens. In *Ackerman's Admr.* v. *Vreeland's Exr., 1 McCart. 23, 29*, Chancellor Green said, it may be relied on as a rule, that every interest in land, however remote the possibility is, may be released. The law on this subject as stated by Sergeant Williams, in his note to *Purefoy* v. *Rogers, 2 Saund. 388k*, and adopted by the supreme court in *Den.* v. *Manners, Spen. 142, 145*, and restated approvingly by Justice Vredenburgh in *Moore* v. *Rake, 2 Dutch. 593*, is this: "It seems now to be established, notwithstanding some old opinions to the contrary, that contingent and executory estates and possibilities, accompanied by an interest, are descendible to the heir, or transmissible to the representative of a person dying, or may be granted, assigned or devised by him, before the contingency upon which they depend takes effect." These authorities make it plain that the first question must be decided in favor of the defendant. At the date of the deed which the defendant puts forward as the foundation of its title there can be no doubt that John Curtis had full power to make an effectual conveyance of the land in controversy.

Assuming for the present that the deed on trial has been sufficiently proved to entitle it to be admitted in evidence, the next question is, what effect shall be given to it. Did it pass the estate of John Curtis in the land in controversy? Its granting clause is in these words:

"Witnesseth that the said John Curtis, for and in consideration of the just and full sum of sixteen pounds, proclamation money, hath remised, released and forever quitclaimed, and by these presents, for himself and his heirs, doth fully, clearly and absolutely remise, release and forever quitclaim unto the said Joseph Lawrence all his right, title, interest and property" &c.

It will be observed that although the grant is not made to the grantee and his heirs, it is made by the grantor for himself and his heirs. This language, standing by itself, and in the absence of any words plainly indicating that the estate to be granted was less than a fee, would seem to furnish very cogent evidence that the grantor intended to convey a fee. That such was the intention of the maker of this instrument is put beyond all question by the language of its *habendum*, which is in these words:

"To have and to hold the above [then designating the thing conveyed] with all and singular the privileges and appurtenances thereunto belonging (reserving liberty to fish and gun), to the only proper use, benefit and behoof of him, the said Joseph Lawrence, his heirs and assigns forever; so that neither he, the said John Curtis, nor Mercy his wife, nor their heirs, nor any other person or persons, for themselves, or any other of the name, or in the name, right or stead of any of them, shall or will, by any way or means, hereafter claim, challenge or demand any right, title or interest of, in or to the said right or any part or parcels thereof."

When the granting clause of a deed is silent as to the estate intended to be conveyed, resort may be had to the *habendum* to ascertain the intention of the grantor in that regard. It cannot be used either to enlarge or diminish the estate specifically defined in the granting clause, for if it is repugnant to that clause it is void, but if that clause is either silent or ambiguous, then the *habendum* becomes the standard by which the estate granted must be measured. The chief-justice, speaking for the court of errors and appeals, in *Staffordville Gravel Co.* v. *Newell*, November Term, 1889, said: "The well-settled rule is, that, if the granting part of the conveyance does not, by clear and definite terms, conclude the question, this clause [the *habendum*], whose office is to define the extent of the ownership granted, may be resorted to. It may be used to explain, but not to vary or control, the premises." And Justice Depue, in speaking for the same court, in *Melick* v. *Pidcock, 17 Stew. Eq. 525, 540,* said: "To create a fee the limitation must be to heirs, but it may be made either in direct terms or by immediate reference, and it is not essential that the word heirs be located in any particular part of the grant." No doubt can be entertained that if this instrument passed anything, it passed a fee.

But it is further said that the deed on trial contains no words
of conveyance, but merely words of release, and as the defend-
ant has admitted by its answer that, so far as it has been able to
discover, the person to whom the release was made, was, at the
date of its execution, without right of any kind in the land
released, the release must, as a matter of law, be adjudged to be
without legal force. Both of the propositions of fact upon which
this contention rests appear to be true. The operating or essential
words of the deed are "remise, release and quitclaim," and it is
also true, that the defendant admits that the person to whom the
deed was made, was, at the date of its execution, without right
in the land released, but, as I understand the law, it does not
follow that the deed, for these reasons, must be adjudged to be
nugatory; on the contrary, I think the law, from the earliest
times, has made it the duty of the courts, in all cases, where it
appeared that the deed put on trial was founded on a valuable
consideration, and there was no reason to declare that it had been
unfairly obtained, to sustain it and carry it into effect, if by law
it were possible to do so. More than a century ago Lord Mans-
field said : " The rules laid down in respect of the construction
of deeds are founded in law, reason and common sense—that they
shall operate according to the intention of the parties, if by law
they may ; and if they cannot operate in one form, they shall
operate in that which by law will effectuate the intention." *Good-
title* v. *Bailey, Cowp. 597, 600.* And in *Sheppard's Touchstone
(1st Am. ed.) 82* the same doctrine is stated in this wise :

"A deed that is intended and made to one purpose may enure to another;
for if it will not take effect that way it is intended, it may take effect another
way. And therefore a deed made and intended for a release may amount to a
grant of a reversion, an attornment or a surrender, or *e converso*. And if a man
have two ways to pass lands by the common law, and he intended to pass them
one way, and they will not pass that way, in that case *ut res valeat* they may
pass the other way."

Judge Hare, in his notes to *Roe* v. *Tranmarr, Willes 682 ; S. C.,
2 Wils. 75,* says : "Any instrument which shows that a title was
meant to be given in return for value received [will be] equally
effectual with the most formal deed : words to raise a use, and

a consideration to support it, being all that is requisite to call the statute of uses into operation and constitute a bargain and sale. A deed which has failed of effect as a release, from the want of an estate in possession in the releasee, or as a feoffment, from want of livery of seizin, may consequently be rendered valid as a bargain and sale by the averment and proof of a valuable consideration, although none is expressed in the writing." *2 Sm. Lead. Cas. (8th Am. ed.) 534.* And Chancellor Kent, while chief-justice of the supreme court of New York, said, in pronouncing the prevailing opinion of that court in *Jackson* v. *Alexander, 3 Johns. 484, 492 :* " The law from the beginning has been very indulgent in helping out deeds on the ground of consideration." And in his *Commentaries* he said : "Any words that will raise a use, will, with a valuable consideration, amount to a bargain and sale." *4 Kent Com. 496 marg.* These citations render it unnecessary to discuss the question as to what effect shall be given to the deed on trial. They make it clear that it passed the land by way of bargain and sale. The deed shows on its face that it was founded on a valuable consideration paid by the grantee; hence, if the deed shall be admitted in evidence, the fact that a valuable consideration was paid for the land, will be established by proof inherent in the deed. No particular form of words is required to raise a use; any words will be sufficient for that purpose which show an intention to convey. That such was the intention of the maker of this instrument is put beyond dispute by the words of the instrument itself. Effect must be given to the deed as a bargain and sale.

We now come to the question, has the deed been sufficiently proved to entitle it to be admitted in evidence? It was not acknowledged, but purports to have been executed in the presence of two subscribing witnesses. If it is an honest paper it was executed over one hundred years ago. This great lapse of time puts it out of the power of the defendant to call the subscribing witnesses, or to produce any direct evidence of the authenticity of the signatures of either the subscribing witnesses or the grantor. All persons who could give such evidence we know must have been dead for years. The antiquity of the paper appears to me

to' be fully established. The paper itself furnishes, as I think, very strong evidence of that fact. Its color and texture show that it is very ancient; its watermark indicates that it was made in the reign of one of the Georges; the spelling and style of penmanship are such as distinguish documents written near the beginning of the present century from those written at a more recent date; and the consideration mentioned in it, it will be observed, is expressed in a currency which, as a matter of history, we know was in use about the time the deed purports to have been made. It is undoubtedly true that all these things might exist if the paper had been forged, but there is no proof suggesting even a suspicion of forgery, and the law never presumes either fraud or crime. Besides, it is not to be supposed, as Judge Harper, of the court of appeals of South Carolina, very pertinently remarked, in *Robinson* v. *Craig, 1 Hill 389, 391,* that a deed would be forged with a view to a fraud to be committed at the end of thirty years. The motive which usually leads to crime is the hope of present gain. No motive of that kind existed in this case. Until quite recently the land in controversy was worthless, not capable of being used with profit for any purpose, a mere barren waste, lying between the waters of the Atlantic ocean and Barnegat bay. Nobody ever had possession of it or exercised any acts of ownership over it until the latter part of 1880, when the defendant built a small house and some fence on it, which it subsequently caused to be removed. From the date of the deed until less than twelve years ago the land was regarded as without present or prospective value. In this state of affairs, it is impossible to believe that anybody would have expended the time and talent requisite in the perpetration of such a complicated forgery simply to place himself in a position where he might set up a claim to a worthless tract of land.

But there is other evidence on this point. The deed on trial, it will be remembered, purports to have been made May 31st, 1788, by John Curtis to Joseph Lawrence. Joseph Lawrence— Curtis's grantee—conveyed the same land to James Price, by deed dated November 16th, 1790. This latter deed, though purporting to have been executed in the presence of three subscribing

witnesses, is unacknowledged, and the same objections are urged against its admission in evidence that are urged against the admissibility of the other.    Joseph Lawrence, in his deed to Price, describes the land which he conveys as that part of Squan Beach " which I bought of John Curtis, which was left to him by his father, David Curtis, deceased, which he bought of Elisha Lawrence, deed bearing date July 9th, 1770." Now, although this description does not say in express words that John Curtis had made a deed to Joseph Lawrence, still I think it says so in substance and effect.    What it says in plain words is, that Joseph Lawrence had bought the land of John Curtis, and as this was said by Joseph Lawrence in the instrument which he used to transfer the title to the land from himself to another—in which instrument, it will be observed, that he describes another transfer of title by almost precisely similar words, namely, " which he bought of Elisha Lawrence, deed bearing date " &c.—there would seem to be no reason to doubt, that what Joseph Lawrence meant by the phrase, " which I bought of John Curtis," and what his grantee understood he meant, was, that the title he was conveying was same title that had been made to him by John Curtis by deed. The phrase under consideration amounted, unquestionably, to a direct and positive assertion of title by Joseph Lawrence, and that he had acquired his title from John Curtis.    This is sufficient, in my judgment, especially when considered in connection with the proof inherent in the paper itself, to justify the presumption that the deed on trial was in existence on the 16th day of November, 1790, when Lawrence conveyed to Price.    A recital in an ancient deed or will of any antecedent deed or document, consistent with its own provisions, will, after the lapse of a long period, be presumptive proof of the former existence of such deed or document, especially in a case where nothing appears to rebut such presumption.    *Fuller ads. Saxton, Spen. 61, 65.*    James Price— Joseph Lawrence's grantee—conveyed the land in question to James Price, junior, by deed duly executed and recorded in December, 1813.    No allusion, however, was made in this deed to either of the two prior deeds.    James Price, junior, together with his wife, conveyed, in 1836, by a deed executed in due form of law,

the land in controversy, to James Johnson. A certified copy of
this latter deed was put in evidence without objection. It refers
in express terms to the deed executed November 16th, 1790, by
Joseph Lawrence to James Price. This reference establishes the
antiquity of that deed. It shows that it was in existence more
than fifty years ago. In my judgment the antiquity of both deeds
is fully established.

But the mere fact that a deed is ancient will not of itself war-
rant the presumption that it is genuine and entitle it to be admitted
in evidence. Even according to the English rule, which seems
to be somewhat more indulgent than that prevailing in this
country, it is required that, in addition to proof of antiquity, there
shall be evidence that the deed comes from the proper custody or
depository, to justify its admission in evidence. Lord Ellen-
borough, in *Roe* v. *Rawlings, 7 East 279, 291,* said: "Ancient
deeds, proved to have been found amongst deeds and evidences
of land, may be given in evidence, although the execution of
them cannot be proved; and the reason given is, that it is hard
to prove ancient things, and the finding them in such a place is a
presumption they were fairly and honestly obtained, and reserved
for use, and are free from suspicion of dishonesty." Stated in
substance, the rule given by Phillipps is this: If an instrument is
thirty years old, and is proved to have come from a proper place
of custody, it may be admitted in evidence without any proof of
its execution. Such an instrument is said to prove itself. *2 Phil.
Ev. 475.* There is proof in this case that the deeds under con-
sideration came from the proper custody. A son of James John-
son, to whom the land in controversy was conveyed in 1836, and
who retained the title until 1880, swears that he saw the deeds in
his father's possession as far back as he can remember. He was
thirty-eight years old at the time he testified. He also said that
he had seen the deeds frequently during his father's life and
looked them over, but would not say that he had ever read them
entirely through. He was sure, however, that they were the same
two deeds which he had seen in his father's possession because of
certain distinguishing marks, which he mentioned, and also be-
cause he found them among his father's papers after his father's

death. He also testified that he delivered the deeds to the persons who afterwards passed them to the defendant.

The foregoing summary shows, I think, that three facts, tending to demonstrate the authenticity of the deed, may be considered proved—*first,* that the deed has been in existence for nearly one hundred years ; *second,* the possession of the deed by James Johnson, to whom the land was conveyed in 1836, warrants the belief that whenever the title to the land changed the deed was delivered to the person taking title as a muninent of his title ; and, *third,* that there have been three different assertions of title to the land under the deed—the first in 1790, when Lawrence conveyed to Price; the second in 1813, when Price conveyed to Price, and the third in 1836, when Price conveyed to Johnson. The first of these—that which was made in 1790—it will be observed, was made so near the time when the deed on trial was executed, that it is highly probable John Curtis heard of it. It is scarcely possible to believe that he did not. He was then living in the neighborhood where the transaction occurred. He did not die until 1812 or 1813. The deed of 1790 was executed in the presence of three witnesses. This fact shows that no effort was made to conceal its execution, but the effort was rather in the opposite direction, to give publicity to it. Such transactions even at this day, in sparsely populated neighborhoods, attract public attention and form the subject of conversation wherever men meet. This was undoubtedly the case in 1790, when such transactions were much less frequent than they are now, and when they doubtless excited much greater general interest than they do now. It thus appears, as I think, that when we come to take an account of the probabilities of the case, the mind is naturally led to believe, from the facts in evidence, that John Curtis must have heard of the conveyance of 1790, and that he did not attempt to defeat it because he knew that Joseph Lawrence in conveying the land had simply done what he had a lawful right to do.

The rule as to what evidence, in addition to proof of antiquity and that the deed comes from a proper source, is required to justify the admission of an ancient deed in evidence, without proof of execution, is not entirely settled in this country. The

cases are entirely harmonious to this extent: that where possession of the land has accompanied the deed, that fact furnishes sufficient evidence of its authenticity to justify its admission, but where possession has not accompanied the deed, the cases are not entirely agreed as to what proof, other than proof of possession, will be sufficient to justify its admission. Professor Greenleaf says that where possession has not accompanied the deed, to justify its admission, there must be other equivalent or explanatory proof. *1 Greenl. Ev. § 144.* The rule, as thus stated, seems to have met the approval of Chief-Justice Green, for, in *Osborne* v. *Tunis, 1 Dutch. 633, 663,* he, in effect, said, the presumption that an ancient deed is genuine only arises in case the deed comes from the proper depository and is accompanied and followed by possession, or in case there is other collateral proof to warrant the belief that the deed is genuine. Chief-Justice Bronson, in *Willson* v. *Betts, 4 Den. 201, 213, 215,* said, that other facts, besides possession, might be sufficient to raise the presumption that an ancient deed was genuine, but he thought that nothing would justify such presumption but acts done under the deed or the recognition of its validity by those having an interest in the other direction. What is called explanatory or collateral proof in some of the cases was defined in *Jackson* v. *Laroway, 3 Johns. Cas. 283, 285,* as follows: Such account must be given of the deed as may reasonably be expected under all the circumstances of the case and as will afford a presumption that it is genuine. This definition has been approved in several cases. *2 Phil. Ev. (4th Am. ed.) 475, note 430 by C. & H.* The supreme court of the United States, speaking by Judge Story, held, in *Barr* v. *Gratz, 4 Wheat. 213, 221,* that where a deed is more than thirty years old, and is proved to have been in the possession of the lessors of the plaintiff in ejectment, and actually asserted by them as the ground of their title in a chancery suit, it is, in the language of the books, sufficiently accounted for, and it is admissible in evidence without regular proof of its execution. The rule, as thus stated, was reiterated by the same court in *Coulson* v. *Walton, 9 Pet. 70, 72.*

The proof in support of the authenticity of the deed on trial comes up, in my judgment, to the required standard. Such an account has been given of it as was reasonably to be expected under the circumstances of the case and as leads naturally to the presumption that it is genuine. Neither party has shown possession; on the contrary, both admit that the land has been vacant for a century, so that possession speaks neither for nor against the deed. But the proofs show that just such use has been made of it, and that just such claims have been made under it, as would, in the usual and ordinary course of such transactions among men at a very early day, have been made, had the persons dealing with it known it to be an honest paper. It has been dealt with, treated and preserved as an honest and valid paper. In addition to this, as I think, the paper bears on its face strong evidence of its integrity. In my judgment, it should be admitted in evidence and full effect given to it.

There is an interlineation apparent on the face of the deed. This, it is said, so greatly discredits it that no effect should be given to it. As originally drawn, the deed described the land conveyed as that undivided half of the one-seventh of Squan Beach which David Curtis left to his son John, without saying whether the half which it conveyed was the half of that seventh which Elisha Lawrence had conveyed to the testator, or the half of the seventh conveyed to the testator by Benjamin Lawrence. The half of the seventh conveyed to the testator by Benjamin Lawrence, it will be remembered, was devised to John absolutely, with an immediate right to possession, while the whole of the one-seventh conveyed to the testator by Elisha Lawrence was devised, in the first instance, to Elisha Curtis and the heirs of his body lawfully begotten, with a limitation over to John of the one-half of that seventh in case Elisha Curtis did not have an heir of his body. As originally drawn, the deed described the land which it conveyed as that half of an undivided seventh of Squan Beach which David Curtis left to his son John. With this description unchanged, there can be no doubt, I think, that the deed would have passed that half of the one-seventh in which John had a present absolute estate, and not the half of the other

seventh in which his estate was liable to be defeated by the birth of issue to his brother Elisha. The interlineation changed this description and made the deed say, that the land which it passed was the half of that seventh part of Squan Beach which David Curtis bought of Elisha Lawrence, by deed bearing date July 9th, 1770. The effect of the interlineation was to change entirely the land upon which the deed was to operate, and to pass to the grantee an estate, which though vested, was nevertheless subject to a life estate, and liable, in addition, to be completely destroyed by the birth of a child, instead of a present absolute estate, which no future event could defeat. This fact would seem to make it as certain as anything can be, in the absence of convincing proof to the contrary, that neither the grantee nor any one claiming under him, inserted the interlineation after the delivery of the deed.

As to the land in dispute, the complainants' bill must be dismissed.