### Grecia TORRES, a Minor, Appearing through Sanjuana TORRES, Her Mother and Next Friend,

v.

### TRINITY INDUSTRIES, INC.

### and

### Grecia Torres, a Minor, Appearing through Sanjuana Torres, Her Mother and Next Friend,

v.

### United States of America

### Nos. 4:90–CV–812–A, 3:96–CV–1870–A.

United States District Court, N.D. Texas, Fort Worth Division.

May 22, 2002.

See also 117 F.3d 208, 229 F.Supp.2d 616.

Frank L. Branson, The Law Offices of Frank L. Branson, Dallas, TX, for plaintiff.

Paula M. Billingsley, Assistant United States Attorney, United States Attorney's Office, Dallas, TX, for United States of America.

*MEMORANDUM* and *ORDERS*

McBRYDE, District Judge.

In this document the court (1) considers, and grants the relief sought by, a motion filed for Grecia Torres (hereinafter "Grecia") for release of funds being held in the registry of the court for her benefit, and (2) considers, and issues orders with respect to, other matters that must be confronted in this case, including the possibility of relieving Grecia of the effects of the final judgment, order approving settlement, and settlement stipulation in number 3:96–CV–1870–R (now number 3:96–CV–1870–A), so that her claims related to the failure of the clerk of this court to

comply with investment directives given the clerk by the court in December 1991 can proceed in an appropriate manner against those persons who might have responsibility for the clerk's noncompliance with those directives.

## I.

### *The Pending Motion to Release Funds*

■ The court has before it for consideration a motion filed May 6, 2002, by George (Tex) Quesada (hereinafter "Mr. Quesada") for Sanjuana Torres (hereinafter "Mrs. Torres"), as next friend for her minor daughter, Grecia, for release of $13,000 of the funds being held in the registry of the court for the benefit of Grecia so that an automobile can be purchased for Grecia's use and to provide automobile insurance coverage.

Mrs. Torres and Grecia are citizens of the Republic of Mexico, who reside in Saltillo, Coahuila, Mexico. The motion and its exhibits indicate that since the death of Mrs. Torres's husband, and Grecia's father, Mrs. Torres has struggled to make ends meet, that Grecia is now enrolled in a university, and that Grecia is in need of a motor vehicle for travel between her home and her university. The facts on which the motion is based are verified by a document in the nature of an affidavit of Mrs. Torres, an English translation of which is attached to the motion. The court finds that Grecia has a legitimate need for an automobile, that her mother does not have the financial resources to provide Grecia with one, and that a disbursement of $13,000 of the funds being held in the registry of the court for the benefit of Grecia should be ordered, on the terms provided in the Orders section of this document.

## II.

### *Other Issues That Must Be Confronted*

#### A. *Overview.*

In the course of reviewing this file preparatory to the taking of action on the motion to release funds, the court has been reminded of other issues in this action, as consolidated, that must be dealt with and resolved.

The funds on deposit in the registry of the court for the benefit of Grecia originated with a settlement of claims asserted in a damage suit, case number 4:90–CV–812–A, filed in October 1990 by Frank L. Branson (hereinafter "Mr. Branson") and his law firm for Mrs. Torres and Grecia against the tortfeasor who caused the death of Grecia's father to recover damages they suffered by reason of Mr. Torres's death. The December 20, 1991, final judgment in number 4:90–CV–812–A awarded $40,000 of the settlement amount to Grecia, to be paid by the defendant to the clerk of this court in trust for the use and benefit of Grecia. Contained in the judgment was an order that the clerk invest the $40,000 deposit in an interest-bearing account "at the highest available rate of interest" and that the funds remain in "such an account" until Grecia reaches the age of majority. 12/20/91 Final J. at 7.

The $40,000 award to Grecia was paid by the defendant in number 4:90–CV–812–A into the registry of the court on December 20, 1991, but the clerk made no investment of the fund until over three years later, when it was invested in a certificate of deposit.

An action, case number 3:96–CV–1870–A,[1] was brought on July 3, 1996, by Mr.

---

**1.** When the action was filed in July 1996 it had a suffix "R" in the case number, but when it was transferred to the docket of the undersigned the suffix was changed to "A."

Except in subsection E of this memorandum, *infra* at 21–29, the number of the action will be used with a suffix "A" even if the reference

Branson and his firm in the name of Mrs. Torres, as next friend for Grecia, against the clerk purportedly to recover for Grecia the damages Grecia suffered by reason of the clerk's noncompliance with the investment directives of the December 20, 1991, judgment. The records of the court indicate that, to put the matter mildly, there were serious irregularities in the filing, processing, and conclusion of that action. More detailed explanations will be given at later points in this memorandum.

Suffice to say here: The interests of Mr. Branson and his firm were in conflict with those of Grecia because the attorneys appear to have been at fault, along with the clerk, in causing Grecia's $40,000 not to be properly invested. The suit was filed in the Dallas Division rather than the Fort Worth Division, where the wrongful death damage suit was pending and Grecia's registry account was kept. The clerk, the now-deceased Nancy Doherty, who was the only defendant when the action was filed, selected the judge to whom the case brought against her would be assigned and caused the case to be direct-assigned to him, all in apparent violation of the then-applicable judge-assignment order, rule, and statute (which required a random assignment). That judge, the Honorable Jerry Buchmeyer (who was then chief judge of this district), was one the clerk knew already had formed a predisposition in her favor on the issue of the degree of her responsibility for failure to properly invest the $40,000 and who had already taken extrajudicial steps on her behalf to protect her from the consequences of her failure to comply with the investment directives in the December 20, 1991, judgment. No guardian *ad litem* was appointed to represent the interest of Grecia in the action, notwithstanding the conflict of interest, which was known to the presiding judge, between Mr. Branson, on the one

hand, and Grecia, on the other, and what appears to have been a legal obligation of the judge to appoint one. There is no indication that Mr. Branson made a meaningful attempt in the case to recover for Grecia the full amount of the loss she suffered because of noncompliance with the investment directives of the December 20, 1991, order. The case was concluded in October 1996 on the basis of an October 25, 1996, settlement agreement, which Judge Buchmeyer approved, that appears to have restricted Grecia's recovery to an amount significantly less than her actual loss. Mr. Branson signed the settlement agreement, and moved to dismiss the action, in the name of Mrs. Torres as next friend for Grecia. The theory of damages urged as justification for the apparently inadequate settlement amount does not appear to have any legal substance. Based on the settlement agreement, Judge Buchmeyer concluded number 3:96–CV–1870–A with an order of dismissal by which the action was dismissed with prejudice.

Now that Grecia is approaching the age of majority, the court must consider the possibility of granting her relief from the conditions of the October 1996 settlement agreement and the order dismissing the action. Specifically, the court must consider the possibility of the making, *sua sponte*, of an order under Rule 60(b) of the Federal Rules of Civil Procedure relieving Grecia of the legal effects of the settlement agreement, the order approving the settlement, and the order of dismissal in number 3:96–CV–1870–A so that, after appointment of a guardian *ad litem* and/or an attorney *ad litem* and the joinder of any additional party defendants, and the assertion of any new claims, as might be appropriate, the action can proceed to a conclusion in a legally proper manner.

is to the pendency of the action on Judge Buchmeyer's docket.

B. *Actions Taken by Judge Buchmeyer that Would Cause Him to be Disqualified Even if the Case Had Been Properly Assigned to Him.*

1. *Judge Buchmeyer's Predisposition in Favor of the Clerk.*

When the undersigned learned in late March 1995 that the $40,000 fund had remained in the court's registry uninvested for more than three years, the court, through the undersigned, issued an order in number 4:90-CV-812-A expressing concern and directing the clerk to provide certain information that would enable the court to reach a decision as to the best method of causing Grecia to be compensated for her loss resulting from the clerk's noncompliance with the investment directives in the December 20, 1991, judgment. Upon receipt of a copy of the order, the clerk took actions that caused Judge Buchmeyer to become involved on her behalf. For convenience, the court is incorporating in this memorandum the following summary given by the Fifth Circuit in *In re McBryde* of Judge Buchmeyer's initial involvement on behalf of the clerk, events that led to his involvement, and related events:

In October of 1990, a civil suit styled *Sanjuana Torres, Individually and ... (Grecia Torres, A Minor) v. Trinity Industries, Inc.* by random assignment fell to Judge McBryde. The suit arose out of the death of Mr. Raimundo Torres, Grecia Torres's father. The parties settled, and Judge McBryde signed a final judgment on December 20, 1991. Judge McBryde ordered the defendant to pay $40,000 to Grecia Torres. The final judgment also ordered the Clerk of the Northern District to "invest the amount deposited in an interest bearing account at the highest available rate of interest" until Grecia Torres reached majority.

The clerk's office did not follow this order. The plaintiff's attorneys in-

formed a financial deputy for the district court that depositing the funds in the U.S. would have adverse tax consequences for Grecia Torres and asked that the clerk hold the funds until the attorneys could set up a Mexican trust fund. Neither the attorneys nor the deputy followed up on this plan, and the $40,000 stayed in the court's treasury for more than three years earning no interest. Intervening audits of the clerk's office's accounts did not uncover the mistake. Nancy Doherty, Clerk of the Northern District, testified at the eventual hearing of the Fifth Circuit Judicial Council's Special Investigative Committee that her office discovered the mistake in early March, but that she first contacted the Administrative Office of the United States Courts to find a solution to the problem before writing to Judge McBryde. On March 24, 1995, Clerk Doherty informed the attorneys for Grecia Torres of the error in writing and sent a copy to Judge McBryde. By this time, the Administrative Office had suggested that Grecia Torres' only remedy was through the Federal Tort Claims Act. That process would take approximately ten weeks.

Six days later, Judge McBryde issued an order in the Torres case. He explained that he did not agree that the FTCA was Grecia Torres' exclusive remedy:

The court is disappointed that there would even be a suggestion that Grecia Torres, a minor, acting through a person or persons who might legally be qualified to act on her behalf, would be required to go to the time and expense to exhaust administrative remedies, through a tort claims process, before being able to obtain relief from violation of an order of this court.... If such order of this court is to have any integrity, enforcement of the order should be the means of

causing Grecia Torres to be made whole for loss resulting from violation of the order (assuming that the clerk is unwilling or unable on her own initiative to take proper corrective measures by causing a sufficient deposit to be made to the minor plaintiff's account).

Judge McBryde's order directed Clerk Doherty to file an analysis and supporting documents to determine the amount of interest Torres had lost.

At the suggestion of Judge Buchmeyer, [FN] Clerk Doherty responded by letter to Judge McBryde, attaching the requested financial information.

> FN. Chief Judge Buchmeyer's memorandum opinion in *Torres* indicated that he had become aware of the case when Clerk Doherty came to him seeking advice in how to respond to Judge McBryde's March 30 order. . . .

Following his suggested language, despite her stated reservations that the phrasing would anger the court, the letter expressed shock and disappointment that Judge McBryde felt it necessary to enter an order to resolve the matter. The letter also informed Judge McBryde that the Clerk's office, the Administrative Office, and the plaintiff's attorneys were working together to reimburse Torres' account via an FTCA action. According to Clerk Doherty, Grecia Torres's interest income would have been between $3,762.68 and $8,112.58, depending on how the clerk's office had decided to invest.

On April 25, Judge McBryde responded with a second order. This order labeled Clerk Doherty's letter in response "so unprofessional and so disrespectful of the undersigned judge and court, and manifest[ing] such a high level of insolence, that it borders on, if it does not constitute, contempt of court by one of its statutory officers." In a long footnote, the order accused Doherty of "insolence," "lack of respect," attempting to "avoid direct confrontation of the consequences of noncompliance with the judgment," and a "lack of understanding [of] the court's responsibilities." The order further suggested that Doherty was "collaborating with the attorney for the plaintiffs in pursuing a remedy that . . . the court considers to be inappropriate." The order concluded by striking Doherty's last letter and ordering her to file into the *Torres* record additional documentation designed to calculate the amount of interest income lost to the Torres account.

. . . . .

On April 27, Judge Buchmeyer, Chief Judge of the Northern District of Texas, entered orders vacating Judge McBryde's order of April 25 and reassigning the *Torres* case from Judge McBryde to himself.

. . . .

On July 21, Judge Buchmeyer filed another memorandum in the *Torres* case labeling the reassignment of that case necessary "to avoid public humiliation and damage to the District Clerk, as well as to the reputation of this Court." 117 F.3d 208, 214–15, 216 (5th Cir.1997), *cert. denied,* 524 U.S. 937, 118 S.Ct. 2340, 141 L.Ed.2d 712 (1998).

Not only did Judge Buchmeyer transfer number 4:90–CV–812–A from the undersigned's docket to Judge Buchmeyer's docket "in order to avoid public humiliation and damage to the District Clerk," he ordered sealed from public view the orders pertaining to the clerk's failure to invest Grecia's $40,000 because he "certainly didn't want the material about Nancy Doherty public." 10/19/95 Tr. at 45.[2] *See*

---

**2.** The "10/19/95 Tr." reference is to the transcript of hearing of the Fifth Circuit Judicial

Council's Special Investigative Committee to

**604**

*also* 7/21/95 opinion [3] at 10 (where Judge Buchmeyer explained that "[b]ecause of the obvious, potential danger to the reputation and career of District Clerk Nancy Doherty—and to the reputation of this Court—I placed the *Torres* file under seal"). Also, Judge Buchmeyer ordered sealed from public view the letter he arranged for Ms. Doherty to use as her response to the March 1995 order that had directed her to provide information concerning the noninvestment of Grecia's $40,000. 4/27/95 order signed by Judge Buchmeyer in 4:90–CV–812–A. He thus protected Ms. Doherty from public disclosure of her own explanation of the clerk's failure to invest the $40,000 and her description of the loss suffered by Grecia by reason of the noninvestment. And, Judge Buchmeyer wrote that one of his goals was to prevent Ms. Doherty from suffering a financial detriment by reason of Grecia's loss. 7/21/95 opinion at 14. He expressed special concern that *"the District Clerk [not be required] to secure legal representation and appeal the dispute to the Fifth Circuit." Id.* (emphasis by Judge Buchmeyer).

The record makes clear that the main objective of Judge Buchmeyer from the outset of his involvement in number 4:90–CV–812–A was to protect, and minimize the damage to, the clerk, and that he had little, if any, concern with the steps that should be taken to ensure payment to Grecia for her actual loss resulting from the clerk's failure to invest her money.

2. *Judge Buchmeyer's Knowledge of the Fault of Mr. Branson in the Noninvestment; Judge Buchmeyer's Advice to Mr. Branson That He Should Not Compensate Grecia for Her Loss; and Judge Buchmeyer's Predetermination that Grecia's Remedy Should Be Under the FTCA.*

As the Fifth Circuit noted in *In re McBryde*, Mr. Branson and his firm played a role in causing the clerk not to invest Grecia's money as the court had directed by the December 21, 1991, order. 117 F.3d at 214. Judge Buchmeyer, in addition to protecting the clerk from the consequences of her failure to abide by the investment order, participated in preventing Mr. Branson from suffering a financial detriment due to his conduct in causing the clerk not to comply with the order. Also, Judge Buchmeyer decided that Grecia's remedy should be limited to a claim under the Federal Tort Claims Act (hereinafter "FTCA"). Thus, starting in March 1995, Judge Buchmeyer played a personal, non-judicial role in the handling of Grecia's claim, to Grecia's detriment. Judge Buchmeyer gave the following testimony on these subjects:

I also called Frank Branson, who was the plaintiff's attorney in the *Torres* case, and talked to him. I think Frank was a little embarrassed because their office was also at fault, just like the district clerk's office was, in *Torres.* Frank actually said, "Tell me how much money it is and I will just write a check and we'll pay our client back." I refused that and said, "No, we can't do that. We will proceed with the Tort

---

which the Fifth Circuit referred in *In re McBryde.* 117 F.3d at 214.

**3.** The "7/21/95 opinion" reference is to an opinion Judge Buchmeyer signed in number

4:90–CV–812–A on that date. There is indication in the court's record that Ms. Doherty and a member of her staff participated in the preparation of this opinion for Judge Buchmeyer's signature.

Claims Act," so we did. The Tort Claims Act recovery has been agreed upon, but it hasn't been paid yet. They are waiting to pay it.

10/19/95 Tr. at 45–46. Notwithstanding the misgivings of the court, expressed through the undersigned, about the suggestion that Grecia be relegated to the FTCA for relief from the consequences of the violation of the court's December 20, 1991, investment order, 3/30/95 order at 3–4, Judge Buchmeyer, while number 4:90–CV–812–A was still on the undersigned's docket, involved himself in communications with Mr. Branson and his office to the end of causing Mr. Branson to file a FTCA claim on behalf of Grecia. 10/19/95 Tr. at 75.

C. *The Rate of Interest at Which The $40,000 Would Have Been Invested in December 1991 If the Investment Order Had Been Complied With; and, Grecia's Loss of Investment Income as of March 1995.*

The letter to which the Fifth Circuit referred as having been sent by the clerk to the undersigned at the suggestion of Judge Buchmeyer, *In re McBryde*, 117 F.3d at 214, was accompanied by items that showed the amount of income that would have been earned between January 1, 1992, and March 20, 1995, on Grecia's $40,000 depending on the kind of investment made with the money. If the investment had been in a money market account, the interest earned would have been $3,762.68 (based on fluctuating interest rates ranging from 2.42% to 3.74% per annum and monthly compounding of interest). If it had been in a series of one-year certificates of deposit, the interest would have been $4,901.82 (based on interest rates ranging from 2.82% to 5.24% per annum and with interest compounded annually). If the investment had been in a ten-year certificate of deposit, the interest would have been $8,112.58 (based on a fixed rate of interest of 5.90% per annum, with interest compounded annually).

Thus, bearing in mind the directive that the clerk invest the $40,000 in an interest-bearing account "at the highest available rate of interest" and that the funds remain in "such an account" until Grecia reaches the age of majority, the information provided by the clerk shows that Grecia had lost by March 20, 1995, at least $8,112.58 in investment income by reason of the clerk's failure to comply with the December 20, 1991, investment order. As will be noted later in this memorandum, Grecia's loss of investment income has continued from day to day thereafter, up until this day.

D. *The Aborted "Settlement".*

The "Tort Claims Act recovery" to which Judge Buchmeyer referred in his October 19, 1995, testimony, *supra* at 604, while agreed upon, was never paid. Its history is as follows:

After Judge Buchmeyer transferred number 4:90–CV–812–A to his docket from the undersigned's in April 1995, and after Judge Buchmeyer and the clerk had arranged that same month for Mr. Branson to file an FTCA claim on behalf of Grecia, Mr. Branson was advised by a May 16, 1995, letter from the Administrative Office of the United States Courts that the Director of that office had "approved payment of Ms. Torres' tort claim in the amount of $5,600.00."[4] A voucher to be

---

4. The technique by which the $5,600.00 "payment" amount was determined is unclear. The record reflects that on April 4, 1995, Mr. Branson filed in the name of Mrs. Torres, as next friend for Grecia, with the Administrative Office an FTCA claim form saying that Grecia's "lost income is $4,901.82 based on an interest rate of 5.09% for the period January 1, 1992–March 20, 1995," and that the claim "included ... a sum of $45.24 per week to cover the interest income lost on the accrued interest between March 20, 1995 and the ten weeks expected in processing this

signed by Mr. Branson or his client to evidence acceptance of the payment was enclosed; and, the letter advised that the General Accounting Office "will issue a check directly to you and Ms. Torres." 5/16/95 letter from Chastain to Branson. Mr. Quesada, who was in Mr. Branson's firm, signed the voucher on May 23, 1995, showing that the amount claimed was $5,600 and that there had been an award, compromise, or settlement in that amount. Voucher for payment under Federal Tort Claims Act, dated 5/23/95. On October 31, 1995, the voucher was approved in the amount of $5,600 by the Administrative Office. *Id.*

When the undersigned received a copy of the May 16, 1995, letter from the Administrative Office to Mr. Branson, the undersigned informed the Administrative Office, the clerk, Judge Buchmeyer, and Mr. Branson that there should not be a resolution of the claim of Grecia unless and until the undersigned approved the proposed resolution, and that the processing of Grecia's claim should go no further until the undersigned received information that would enable him to determine the appropriateness of the amount to be paid into Grecia's account. This letter, which was filed in number 4:90–CV–812–A on May 26, 1995, concludes as follows:

Of course, we all are aware of the problems generated by the purported "reassignment" by Chief Judge Buchmeyer of this action from my docket to his. I do not consider that the "reassignment" has any legal force or affect; and, my view is that I am the district judge responsible for this action.

By copy of this letter to others concerned, I am advising them that I expect

that there will be no action taken that has any affect on the rights of Grecia Torres until I have full information and have approved the taking of the action. 5/25/95 letter to Ms. Doherty filed 5/26/95 at 1–2.

Notwithstanding the undersigned's May 25, 1995, letter, the settlement activity went forward. The Administrative Office, acting through an assistant general counsel, sent a letter to Judge Buchmeyer on June 5, 1995, in which he explained:

I am writing in further reference to the pending tort claim in the above-captioned case.

Mr. Branson, attorney for Ms. Torres and her daughter, has relayed to our office his clients' acceptance of a settlement under the Federal Tort Claims Act in the amount of $5,600 for the interest that was not earned on their registry fund, plus interest on interest starting from the date the fund was deposited in an interest-bearing account. On Tuesday, May 30, I received from the law office the tort claim voucher signed by counsel, reflecting the claimant's acceptance of the settlement amount in complete satisfaction of the claim. The voucher is now ready for transmission to the Claims Group at the General Accounting Office, which issues payment on tort claim settlements exceeding $2,500.

The agreed settlement figure is based on interest rates for deposit instruments that the clerk's office typically uses for registry funds of this kind and amount. Our office feels that this figure compensates the claimants adequately, putting them in the same financial position they would enjoy had the funds been held at

---

claim." FTCA claim form at 2. Apparently Ms. Doherty suggested language to be used by Mr. Branson in the form. *See* 4/4/95 letter from Doherty to Quesada at 1. The form contains no explanation why Mr. Branson did not

make a claim on behalf of Grecia for the full amount of her loss, as it had been defined by the clerk, *supra* at 605, or of what, if any, role the "interest rate of 5.09%" played in the claim.

interest immediately upon entry of the deposit order.

As Mr. Burchill discussed with you by telephone, the Federal Tort Claims Act offers the only access to Federal funds for this purpose. The settlement amount includes an allowance for about 15 additional weeks of interest on interest, to compensate the claimants for the delay built into the process by the statutory requirement that we submit the claim to the General Accounting Office for payment. 28 U.S.C. § 2672, third paragraph. I appreciate the support you expressed to Mr. Burchill for sending the claim forward for payment as soon as possible.

I hope this letter reassures you that the Administrative Office has acted fairly and promptly in this matter.

5/5/95 letter from Chastain to Buchmeyer, filed in number 4:00–812–A on 6/21/95 at 1–2.

By letter of October 23, 1995, Circuit Judge Henry A. Politz, who was then the Chief Judge of the United States Court of Appeals for the Fifth Circuit, informed the clerk that she was to proceed in number 4:90–CV–812–A as directed by Judge Buchmeyer, and that "[t]he instructions contained in the letter to you under date of May 25, 1995 from Judge John McBryde are vacated ...." 10/23/95 letter from Politz to Doherty.

The illusion that a $5,600 settlement of the FTCA claim had been reached came to an end in mid-December 1995 [5] when the U.S. Department of Justice, acting through Jeffrey Axelrad, Director, Torts Branch, informed the Administrative Office, through its associate director and general counsel, by letter of December 13, 1995, that the Department of Justice would not honor the settlement agreement, stating, in conclusion, that:

The initial administrative claim was filed on or about April 4, 1995. It sought "4901.82 to date $45.24/wee[k]." The $45.24 per week can only be seen as interest of the kind that is clearly excluded from the FTCA's general waiver of sovereign immunity. Giving all possible deference to the agency involved, the Department of Justice does not oppose a settlement of this claim for $4901.82, although there are strong arguments for rejecting any settlement. We cannot concur in a larger amount which would clearly be compensation for interest lost after the claimants knew of their injury and had presented their claim.

I hope this letter is helpful to you. Because it sets forth our analysis of a pending claim and our approach to settlement, it should not be shared with any party outside the government.

12/13/95 letter from Axelrad to Burchill. Put charitably, the reasons given in Mr. Axelrad's letter for the Department of Justice's refusal to honor the $5,600 settlement agreement appear to be utter nonsense.[6] Nevertheless, the letter did bring

---

**5.** The court's records reflect that before November 28, 1995, the General Accounting Office had told the Administrative Office that the FTCA claim was not the proper avenue for relief for Grecia and that, instead, the "claim might more appropriately be paid by the Administrative Office from appropriated funds." 11/28/95 letter from Burchill of Admin. Office to Schutt of GAO at 2. Although Judge Buchmeyer and Ms. Doherty were so informed at that time, they did nothing to change the FTCA direction of Grecia's claim.

**6.** The principal argument made in the Department of Justice letter against Grecia's claim was that it cannot be asserted because it seeks payment of interest. In support of that contention, the author of the letter makes reference to language in the FTCA that prohibits an award of prejudgment interest against the United States. Five pages of the letter are devoted to developing the argument that Grecia's claim should be denied in its entirety for that reason. The Department of Justice overlooked what should be obvious to anyone— Grecia's damage claim is not for recovery of

to an end the activity that had been ongoing for approximately eight months over the possibility of a payment of an inadequate $5,600 in satisfaction of Grecia's claim under the FTCA. The FTCA claim made in Grecia's name proved to be a bureaucratic nightmare, just as the undersigned had predicted when he learned in March 1995 that she was being relegated to that remedy. As the discussion in the immediately following section of this memorandum indicates, Grecia's claim next found itself in a judicial quagmire.

E. *The Institution and History of No. 3:96–CV–1870–R.*[7]

1. *The Institution of the Action.*

On July 3, 1996, Messrs. Branson and Quesada filed a complaint in the Dallas Division of this court in the name of Mrs. Torres, as next friend of Grecia, against Ms. Doherty, as clerk of this court, which was docketed as number 3:96–CV–1870–R. The complaint alleged that the employees of the clerk's office engaged in negligent conduct in failing to place Grecia's $40,000 in an interest-bearing account, and that such conduct was a proximate cause of Grecia's damages in the amount of $5,600. There is no explanation why recovery was not sought for Grecia's actual damages, which as of the filing of the suit approached $10,000 for investment income she already had lost. Nor was any reference made in the complaint to the conduct of Mr. Branson that played a role in causing the fund not to be invested.

2. *The Irregular Assignment of the Case to Judge Buchmeyer.*

When the action was filed, assignment of newly filed cases to the judges of this court in the Dallas Division was governed by an order that directed that civil cases in the Dallas Division "will be assigned by random draw." Special Order No. 3–137 signed August 21, 1995. The order specified the percentage of cases to be received by each judge through the draw. The direct assignment of a newly-filed case by the clerk to a particular judge would be in violation of the order. Moreover, such a direct assignment would be in violation of then-existing Rule 4.1 of the Local Rules of this court, which directed that:

> The Judges of this District shall determine the method by which all civil and criminal cases are to be assigned to the individual judges. The Clerk shall have no discretion in the assignment of cases.

And, such a direct assignment would be in violation of 28 U.S.C. § 137, which provides, in pertinent part, that:

### § 137. Division of business among district judges

> The business of a court having more than one judge shall be divided among the judges as provided by the rules and orders of the court.

> The chief judge of the district court shall be responsible for the observance of such rules and orders . . . .

---

prejudgment interest; rather, her claim is that she was damaged by reason of the failure of the clerk to comply with an order of the court to invest her money, and to keep it invested, at the highest rate of interest available. Though it can accurately be said that Grecia's damages are in the form of lost investment income, no one can seriously contend that her claim is for prejudgment interest on her damages. The unusual wording of

the FTCA claim form, *supra* at 605 n. 4, did, however, provide Mr. Axelrad an excuse for maintaining that the claim, as submitted, included a claim for interest on lost investment income.

7. In this subsection of this memorandum, the suffix "R," which the case carried until it was transferred to the undersigned's docket, is used.

Failing to comply with Special Order No. 3–137, Local Rule 4.1, and 28 U.S.C. § 137, Ms. Doherty directed her staff to bypass the random draw required by making a direct assignment of the newly filed number 3:96–CV–1870–R to Judge Buchmeyer. The clerk's conduct was exacerbated by the fact that she knew that Judge Buchmeyer already had become involved on her behalf in the controversy that led to the filing of the suit, and that he already had made known his predisposition to her position in the suit, his preference for the kind of action that should be asserted on behalf of Grecia, and his idea of what an acceptable outcome of the controversy would be.

Of course, Judge Buchmeyer himself failed to comply with the order, rule, and statute by presiding over the case after it had been directly assigned to him.[8] This is not to mention the impropriety of Judge Buchmeyer's failure to recuse because of his personal and extrajudicial involvement, *supra* at 602–05, in the facts that surrounded the litigation. *See* 28 U.S.C. §§ 455(a) and (b)(1).

3. *The Proceedings That Resulted in Dismissal of Grecia's Claims in No. 3:96–CV–1870–R.*

Number 3:96–CV–1870–R took an unusual, but perhaps not unexpected (considering the events that led to it), course. Judge Buchmeyer did not appoint a guardian *ad litem* for Grecia. On September 17, 1996, about two-and-a-half months after the action was filed, Judge Buchmeyer, apparently *sua sponte*, signed an order directing the plaintiff to file a supplemental complaint "naming the United States as the Defendant in this case by September 25, 1996," that "[t]he United States and Nancy Doherty shall file their answer by October 4, 1996," and that the case be tried on October 25, 1996. Rather than to file a supplemental complaint, Mr. Branson filed on September 20, 1996, in the name of Mrs. Torres, as next friend of Grecia, a first amended original complaint by which the United States was substituted for Ms. Doherty as the defendant. Otherwise, the allegations were basically the same as those of the original complaint. The dollar amount of the claim was still limited to $5,600. On October 4, 1996, the United States filed her answer. Nothing was filed in response to Judge Buchmeyer's September 17, 1996, directive that Ms. Doherty file her answer by October 4, 1996.

In the answer of the United States, she alleged as affirmative defenses that (a) the claims asserted in the suit "are barred as a matter of law under the doctrine of absolute quasi-judicial immunity; and accordingly, plaintiff must take nothing by this suit," (b) even if the defendant is found negligent, "no award of damages may, as a matter of law, exceed the fixed sum certain specified in the administrative tort claim submitted to the Administrative Office of the United States Courts, which is $4,901.82," and (c) "plaintiff's attempt through its administrative tort claim to seek an additional $45.24/week, after the date of submission of her written administrative tort claim to the Administrative Office of the United States Courts, constitutes a claim for pre-judgment interest which is expressly barred by federal law." Def's. Answer filed 10/4/96 at 2–3.

On October 25, 1996, the day the case was scheduled to go to trial, Mr. Branson

---

**8.** The court recognizes the possibility that Judge Buchmeyer instigated, or otherwise participated, in causing the case to be directly assigned to him. If the case assignment happened that way, Judge Buchmeyer's culpability would be even greater than suggested by the text; and, in such an event, the clerk's conduct would be more understandable, but, nonetheless, apparently inexcusable.

filed, in the names of Mrs. Torres and Grecia, a motion to dismiss with prejudice consistent with a Stipulation for Settlement and Compromise, which was filed at the same time. The latter document was signed by Mr. Quesada, purportedly on behalf of Mrs. Torres and Grecia, and an assistant United States attorney for the United States. It recited, *inter alia*, that, in exchange for a payment by check made payable to Mrs. Torres, as next friend for Grecia, and Mr. Branson in the amount of $4,901.82, without interest, the plaintiff would move for dismissal of the action in its entirety with prejudice, with each side bearing its respective costs of court and attorneys' fees. Paragraph 6 of the document contains the following recitation:

> [T]he plaintiff stipulates, agrees and understands that, by entering into this Stipulation for Settlement and Compromise, she does hereby forever waive, abandon, release and forever discharge the defendant United States America [sic], its agencies, its officers, agents and employees, in their official and individual capacities, and the Clerk of the United States District Court for the Northern District of Texas and her officers, agents and employees, in their official and individual capacities, for each, any and all claims, actions, causes of action whatsoever, in law or in equity, which she now has or which she may hereafter have, arising out of or from the factual circumstances giving rise to the above-styled and numbered cause.

Stipulation for Settlement and Compromise at 3. In other words, the document contemplated that, for a payment made in late October 1996 of $4,901.82, Grecia gave up all her claims, which already were far in excess of that amount, including whatever future claim she might have based on the failure of the clerk to abide by the directive of the court to keep Grecia's $40,000 invested at the "highest available rate of interest" (as the situation existed on December 20, 1991) until Grecia reaches the age of majority.

Another document signed on October 25, 1996, was an order signed by Judge Buchmeyer approving the Stipulation for Settlement and Compromise. The order recites that the settlement document is expressly approved by the court, "[c]onsistent with the Court's findings and conclusions stated for the record in open court at the hearing conducted on October 25, 1996." The transcript of that "record" consists of five pages of conversation between Judge Buchmeyer, the assistant United States attorney representing the government, Mr. Branson, and Ms. Doherty. No evidence was offered. The record does not contain any of the findings and conclusions to which Judge Buchmeyer referred in his October 25, 1996, order approving the settlement—only the ultimate determinations by Judge Buchmeyer that "I will approve the settlement and I will sign the necessary papers closing the case." 9/25/96 Tr. at 7. The exchanges that occurred on the record before Judge Buchmeyer made that statement have the appearance of a charade designed to create the false impression of a reasoned evaluation of the merits of the amount paid in settlement of Grecia's claim. Included was the following exchange between Judge Buchmeyer and Mr. Branson:

> THE COURT: Okay. Mr. Branson, you're convinced that that is the maximum amount that you're entitled to get?
>
> MR. BRANSON: Yes, Your Honor. And having been a taxpayer for number of years love for the government to overpay but—

*Id.* at 5. The judge accepted this response from an attorney he knew had interests adverse to Grecia's.

The final step taken on October 25, 1996, was the signing by Judge Buchmeyer of an

order dismissing number 3:96–CV–1870–R with prejudice, which was entered on the docket that same day.[9]

### F. The Return of No. 4:90–CV–812–A, and the Transfer of 3:96–CV–1870–A, to the Undersigned's Docket.

On July 2, 1997, the United State Court of Appeals for the Fifth Circuit rendered an opinion and judgment holding that Judge Buchmeyer's April 1995 transfer of number 4:90–CV–812–A to his docket was unlawful, and vacated the transfer order. *In re McBryde*, 117 F.3d at 230. Then, on July 21, 1997, the undersigned signed an order in number 4:90–CV–812–A vacating the orders signed by Judge Buchmeyer in that case.

Judge Buchmeyer signed an order on March 25, 1998, in number 3:96–CV–1870–A transferring that case to the docket of the undersigned for consolidation with number 4:90–CV–812–A, because of a motion filed by Mr. Quesada in number 3:96–CV–1870–A on behalf of Mrs. Torres and Grecia for withdrawal of funds on deposit for Grecia's account. The funds were carried in number 4:90–CV–812–A. By order signed May 21, 1998, the two actions were consolidated under the style and number that appear at the beginning of this memorandum.

### G. The Approximate Amount of the Loss Grecia Had Suffered as of January 2, 2002, by Reason of the Clerk's Failure to Comply With the December 20, 1991, Investment Order.

If Grecia's $40,000.00 had been invested in an interest-bearing account "at the highest available rate of interest" and been kept in "such an account," 12/20/91 Final J. at 7, Grecia would have had $62,761.59 in her account as of January 1, 2002, as reflected by the table set forth below, which takes into consideration two withdrawals that were made from the account at Mrs. Torres's request and assumes the deduction of a registry fee of 10% on interest earned:

Case # 4:90–CV–812–A
Investment Balance
If 10 Year CD Purchased 1/1/92 at 5.90%

| Date | | Number | Interest | Withdrawals | Balance | Cumulative |
| From | To | of Days | Rate | | | Interest |
| | | | | | 40,000.00 | |
| 1/1/92 | 1/1/93 | 366 | 5.90% | | 42,360.00 | 2,360.00 |
| 1/1/93 | 1/1/94 | 365 | 5.90% | | 44,859.24 | 4,859.24 |
| 1/1/94 | 1/1/95 | 365 | 5.90% | | 47,505.94 | 7,505.94 |

9. Notwithstanding the haste displayed in bringing Grecia's claim to a conclusion for $4,901.82, the court's records reflect that the $4,901.82 settlement amount was not paid into her account in the registry of the court until four months later, on February 25, 1997, thus causing Grecia additional loss of investment income. Then, in June 1997 the clerk withdrew ten percent of the $4,901.82 deposit, and kept it as a registry fee—in other words, the clerk charged Grecia a fee on the amount Grecia received in settlement of her claims against the clerk as if the settlement amount was routine investment income earned on Grecia's $40,000. Not until the clerk was confronted by the undersigned concerning this inappropriate withdrawal of $490.18 from Grecia's account did the clerk reinstate that amount in the account almost a year after the withdrawal occurred. Even then, the clerk declined to give Grecia the benefit of any interest that would have been earned on the $490.18 had it not been improperly taken from Grecia's account about a year earlier.

| | | | | | | |
|---|---|---|---|---|---|---|
| 1/1/95 | 1/1/96 | 365 | 5.90% | | 50,308.79 | 10,308.79 |
| 1/1/96 | 1/1/97 | 366 | 5.90% | | 53,277.00 | 13,277.00 |
| 1/1/97 | 1/1/98 | 365 | 5.90% | | 56,420.35 | 16,420.35 |
| 1/1/98 | 1/14/98 | 13 | 5.90% | | 56,538.91 | 16,538.91 |
| 1/14/98 | 1/14/98 | | | (454.20) | 56,084.71 | 16,538.91 |
| 1/14/98 | 12/16/98 | 336 | 5.90% | | 59,130.80 | 19,585.00 |
| 12/16/98 | 12/16/98 | | | (3,900.00) | 55,230.80 | 19,585.00 |
| 12/16/98 | 1/1/99 | 16 | 5.90% | | 55,373.64 | 19,727.84 |
| 1/1/99 | 1/1/00 | 365 | 5.90% | | 58,640.69 | 22,994.89 |
| 1/1/00 | 1/1/01 | 366 | 5.90% | | 61,109.97 | 26,464.17 |
| 1/1/01 | 1/1/02 | 365 | 5.90% | | 65,774.45 | 30,128.65 |

Registry Fee (10%) of interest earned (3,012.87)

Balance as of 1/1/02 62,761.59

There might be a question as to whether a 10% registry fee is appropriate, bearing in mind regulations that have been adopted since January 1, 1992, that contemplate a reduction of the registry fee to 7.5% on funds after they have been invested for a period exceeding five years. Another unknown is whether withdrawals would have been permitted before maturity of the CD without penalty.

In contrast, as of January 2, 2002, the actual balance in Grecia's registry account was $53,944.53. That balance includes the addition to the account in February 1997 of the $4,901.82 amount derived from the payment in number 3:96–CV–1870–A and takes into account the two withdrawals shown above and actual deductions of registry fees. Thus, as of January 1, 2002, Grecia's actual investment loss (reduced by the part reimbursement made to her account in February 1994) resulting from non-compliance with the court's investment directives appears to have been $8,871.06. Her loss could be greater by the time she reaches the age of majority, depending on whether the clerk could have made the initial investment in late 1991 or early 1992 at the same rate for a period longer than ten years. The interest rates at which Grecia's money was actually invested during the ten years between January 1, 1992, and January 1, 2002, ranged from 1.51% per annum to 8.90% per annum, with an average rate of about 4.50% per annum.

While in the federal court scheme of things, Grecia's apparent damages do not appear to be great, in her circumstances they are significant.

### H. The Court Tentatively Has Concluded That Grecia Should be Given Relief Under Rule 60(b).

■ The order signed by the undersigned on July 21, 1997, vacating orders signed by Judge Buchmeyer in number 4:90–CV–812–A, *supra* at 611, concluded with the following message to Mr. Branson and the clerk:

> The court encourages counsel for Grecia Torres and the Clerk to take steps, if they have not already done so, to cause the trust account held by the Clerk pursuant to the December 20, 1991, final judgment in this action to have in it the balance it would have if there had been compliance with the directives of such final judgment and to ensure that the investment directives of that order are complied with in the future.

7/21/97 order at 4. Considering the willingness of Mr. Branson in the spring of 1995 to "just write a check [to pay his] client back," *supra* at 605, the court was optimistic that, once the litigation no longer was under the auspices of Judge Buchmeyer (who had instructed Mr. Branson not to

make such a payment), the responsible parties would take appropriate steps to cause Grecia's registry account to be put and kept at the level at which it would be if the December 20, 1991, investment directive had been honored. But, so far as the court knows, no one has taken any step to cause Grecia's registry account to be put at the proper level. Consequently, the court must consider granting Grecia relief under the authority of Rule 60(b) of the Federal Rules of Civil Procedure.

 The granting of a Rule 60(b) motion relieving Grecia of the burdens of the documents that were filed in number 3:96–CV–1870–A(R) on October 25, 1996, would be consistent with a duty the court owes to Grecia. *See In re Moore*, 209 U.S. 490, 497, 28 S.Ct. 585, 52 L.Ed. 904 (1908) (saying that "[t]he court, whose duty it is to protect the interests of the infant, should see to it that they are not bargained away by those assuming ... to represent him"); *Coulson v. Walton*, 34 U.S. 62, 84, 9 Pet. 62, 9 L.Ed. 51 (1835) (saying "[i]t is the duty of the court to protect the interests of minors"). *See also Johnson v. Ford Motor Co.*, 707 F.2d 189, 194 (5th Cir.1983). "[T]he court should, *on its own motion*, determine whether the infant's interests are adequately protected." *Chrissy F. v. Miss. Dep't of Pub. Welfare*, 883 F.2d 25, 27 (5th Cir.1989). " '[T]he infant is always the ward of every court wherein his rights or property are brought into jeopardy, and is entitled to the most jealous care that no injustice be done him.' " *duPont v. Southern Nat'l Bank of Houston, Tex.*, 771 F.2d 874, 882 (5th Cir.1985) (quoting *Richardson v. Tyson*, 110 Wis. 572, 86 N.W. 250, 251 (1901)). Rule 17(c) of the Federal Rules of Civil Procedure provides, in pertinent part, that "[t]he court shall appoint a guardian ad litem for an infant ... not otherwise represented in an action or shall make such other order as it deems proper for the protection of the infant...." Nonappointment of a guardian *ad litem* when appropriate constitutes "a failure to exercise a legally required discretion." *United States v. 30.64 Acres of Land*, 795 F.2d 796, 805 (9th Cir.1986).

The appearance is that, if Judge Buchmeyer been performing his duty to protect the interests of Grecia, he, at the least, would have appointed a guardian *ad litem* to represent her interests in 3:96–CV–1870–R before Grecia's claims were concluded by the October 25, 1996, orders approving the settlement and dismissing Grecia's claims with prejudice. Of course, if Judge Buchmeyer had properly respected Grecia's interests, it is unlikely that he would have presided over the case that was directly assigned to him rather than to insist that the clerk follow the mandated random-assignment procedures.

While the court has not prejudged the outcome, the court must take into account the indications of irregularity reflected by the records of the court in determining whether Rule 60(b) relief should be granted. Perhaps there is a legal reason, not readily apparent to the court, why Grecia received $4,901.82 in 1996 rather than the approximately $10,000 she seemingly had already lost at that time as a result of the clerk's failure to comply with the investment order. Perhaps there is a legal explanation for the noncompliance with the random assignment scheme, and for the direct assignment of number 3:96–CV–1870–A to Judge Buchmeyer, that has not yet come to light.[10] And, there might well

10. Upon learning of the direct assignment of number 3:96–CV–1870–A, the undersigned sought from the office of the clerk information that would disclose whether Judge Buchmeyer had caused other direct assignments of newly filed cases to be made during his tenure as chief judge of this court. That information was denied to the undersigned when, after the clerk informed Judge Buchmeyer of the request, Judge Buchmeyer

be acceptable explanations for the other apparent irregularities mentioned in the preceding parts of this memorandum. But, as the record now stands, there appear to have been serious missteps in the judicial processes adversely affecting Grecia's financial interests that should, at this time, be exposed to the light of day [11] and dealt with in such a way that Grecia's rights can be vindicated.

■ While Rule 60(b) contemplates by its language that relief granted thereunder will be "[o]n motion," the rule of the Fifth Circuit, consistent with the rules of other circuits, is that Rule 60(b) relief can be granted *sua sponte* by the court after notice to the parties and, presumably, an opportunity to be heard. *See McDowell v. Celebrezze*, 310 F.2d 43, 44 (5th Cir.1962).[12] *See also Fort Knox Music Inc. v. Baptiste*, 257 F.3d 108, 110–11 (2d Cir.2001); *Kingvision Pay–Per–View Ltd. v. Lake Alice Bar*, 168 F.3d 347, 351–52 (9th Cir. 1999).

The court tentatively has concluded that the court should, pursuant to the authority of Rule 60(b), order that the October 25, 1996, documents in number 3:96–CV–1870–A (the Stipulation for Settlement and Compromise, the Order Approving Stipulation for Settlement and Compromise, and the Order of Dismissal With Prejudice) are of no force and effect, and are set aside in their entirety. The (3) part of Rule 60(b) authorizes relief under the rule if there has been fraud. There is indication that the October 25, 1996, documents in number 3:96–CV–1870–A are tainted with what is tantamount to fraud in which the court itself participated. In any event, an order granting Grecia relief would appear to be appropriate under the (6) part of Rule 60(b), which provides that "the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (6) any other reason justifying relief from the operation of the judgment." The facts and circumstances related above seem to justify relief from the operation of the October 25, 1996, documents in number 3:96–CV–1870–A. Grecia does not appear to have been properly represented in the action; the judge who presided over the action apparently should not have been presiding; the judge who presided over the action does not appear to have properly protected Grecia's interests; and, the outcome of the action seems to have been contrary to the interests of Grecia. The institution, prosecution, and conclusion of the action seem to be a mockery of the legitimate expectations of a litigant in a United States District Court.

---

directed the clerk not to furnish the requested information.

**11.** Recently, a judge of the United States Court of Appeals for the Sixth Circuit used words that are appropriate here:
> Public confidence in this court or any other is premised on the certainty that the court follows the rules in every case, regardless of the question that a particular case presents. Unless we expose to public view our failures to follow the court's established procedures, our claim to legitimacy is illegitimate.

*Grutter v. Bollinger*, 288 F.3d 732, 814 (6th Cir.2002) (Batchelder, J., dissenting).

**12.** In *Matter of American Precision Vibrator Co.*, a Fifth Circuit panel said, "Rule 60(a) authorizes courts to correct mistakes sua sponte, while Rule 60(b) requires a motion by a party," 863 F.2d 428, 432 (5th Cir.1989), but that statement was *dicta*. Even if that were not so, the statement would not be binding on this court because it is inconsistent with the Fifth Circuit's ruling in *McDowell* that Rule 60(b) relief can be granted by the court on its own motion. *See Matter of Dyke*, 943 F.2d 1435, 1442 (5th Cir.1991); *Boyd v. Puckett*, 905 F.2d 895, 897 (5th Cir.1990).

If there is not an adequate explanation for those appearances of irregularities, Grecia should be permitted, through proper representation, to pursue claims for her full damages resulting from noncompliance with the court's December 20, 1991, investment directives. She would be permitted to explore and assert, if appropriate, whatever claims might exist outside the confines of the FTCA for noncompliance with the December 21, 1991, investment directive. She should be given an opportunity to join any additional parties, such as Mr. Branson, who could have liability to her for her loss resulting from noncompliance with the investment directives. Grecia should be permitted to assert as well whatever claim might exist against Mr. Branson for impairing, through an inadequate FTCA claim or otherwise, her ability to make full recovery from the United States or her agents for Grecia's damages. If there have been any constitutional violations by any government official or agent that played a role in causing her damages, she should be permitted to assert *Bivens* [13] claims based on those violations if any such claim is viable. If any nongovernmental entity, such as Mr. Branson or his firm, is subject to any claim by Grecia for exemplary damages, she should be permitted to assert those claims. A tentative conclusion of the court is that a guardian *ad litem* should be appointed for Grecia to assist in the assertion of whatever claims, and in the taking of such other steps, as are appropriate to vindicate Grecia's rights. In addition, the court is considering the possibility of the designation of an English-speaking next friend to be substituted for Mrs. Torres as Grecia's next friend in the prosecution of her claims, and

is giving consideration to the naming of an attorney *ad litem* for Grecia, perhaps giving the guardian *ad litem* or the next friend a duel role.

Before proceeding further, however, the court is allowing those who were affected by the October 25, 1996, proceedings in number 3:96–CV–1870–A, including the attorneys who have provided representation to Grecia and her mother, to be heard in writing on the court's tentative conclusions and proposed courses of action.

### III.

### ORDERS

A. *Disbursement Orders:*

The court ORDERS that the motion to release funds be, and is hereby, granted to the extent provided in this order, and that the clerk be, and is hereby, directed to issue a check payable to Sanjuana Torres in the amount of $13,000 from the account established by the clerk of this court on behalf of Grecia Torres, a minor, and to deliver such check to George (Tex) Quesada for transmittal to Sanjuana Torres.

The court further ORDERS that such $13,000 be used for the benefit of Grecia Torres and the purposes described under the heading "The Pending Motion to Release Funds" on pages 2–3 of the foregoing memorandum.

The court further ORDERS that, upon receipt of the $13,000 check from the clerk payable to Sanjuana Torres, George (Tex) Quesada promptly forward such check to Sanjuana Torres, with instructions to her concerning the uses that must be made of

---

**13.** *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

the funds represented by the check, and giving her instructions as to the things she must do to be in compliance with these orders.

The court further ORDERS that by July 22, 2002, Sanjuana Torres provide to George (Tex) Quesada receipts or other proof showing the uses she made of such $13,000, and that no later than 4:30 p.m. on August 5, 2002, George (Tex) Quesada file an accounting disclosing how such funds were spent, which is to include as exhibits receipts or other documentation, with English translations of any that are in Spanish, verifying the nature of the expenditures and that they were for the benefit of Grecia Torres.

B. *Order Related to Other Issues:*

The court ORDERS that, if the United States, the attorneys who have represented Mrs. Torres and Grecia Torres, or any other person who has an interest in the issues discussed in the foregoing memorandum, objects to, or disagrees with, any of the tentative conclusions or proposed courses of action stated in such memorandum, she, he, or it file in the above-captioned proceeding by 4:30 p.m. on June 21, 2002, a document setting forth all such objections and disagreements and all reasons therefor.